**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

GREYSTONE CONDOMINIUM AT )
BLACKHAWK OWNERS ASSOCIATION, INC., )
                                       )
                   Plaintiff, )      Case No.: 3:19-cv-00768-SLC
                                         )
      v. )
                                           )
AMGUARD INSURANCE COMPANY, )
                                           )
                 Defendant. )

**DEFENDANT AMGUARD INSURANCE COMPANY'S RESPONSE IN OPPOSITION
TO PLAINTIFF GREYSTONE'S MOTION FOR SUMMARY JUDGMENT**

Defendant, AmGUARD Insurance Company ("AmGUARD"), by and through its undersigned counsel, respectfully submits this Response in Opposition to Plaintiff Greystone Condominium at Blackhawk Owners Association, Inc. ("Plaintiff" or "Greystone") Motion for Summary Judgment ("Motion"):

**INTRODUCTION**

Greystone's Motion seeks a summary judgment finding that AmGUARD breached its insurance contract with Greystone and committed bad faith in connection with a claim for insurance coverage arising from a fire on August 13, 2018, such that: (1) AmGUARD is liable for damages flowing from the purported breach or breaches of contract; (2) Greystone is entitled to statutory damages for alleged bad faith; and (3) Greystone is entitled to statutory prejudgment interest. The Motion seeks this relief even though it is undisputed that: (i) the rebuild project was completed on time, (ii) for far less than Greystone's experts estimated, (iii) AmGUARD has paid every cost incurred with the mitigation and rebuild of the subject property, and (iv) AmGUARD paid Greystone $257,056.23 *in excess* of what it actually cost to mitigate and rebuild the subject property which Greystone pocketed.

The Motion focuses on the allegation that from February through May 2019, AmGUARD took too long to pay what Greystone contends was an "undisputed" claim (it was not), failed to follow the advice of its retained experts (it did not) and otherwise discusses immaterial details on what Greystone thinks should have been included in AmGUARD's communications to Greystone. Yet for all the hyperbole in Greystone's Motion, nowhere does it acknowledge that the principal disagreement between the parties during the relevant time period concerned *estimates* of what it might cost to clean-up, repair and rebuild the subject property. These were not "final" numbers or "lowball offers" intended to conclude the claim so that AmGUARD could wash its hands of the claim as Greystone implies. As with any loss of this magnitude, claims involving extensive mitigation and complex rebuilds are ongoing and evolve as the work is completed, along with the estimated costs to complete that work.

Indeed, to put this all in perspective, at the time Greystone contends that it was "forced" to invoke the appraisal clause in order to "force payment" from AmGUARD, less than one third of the construction had been completed. When the work was actually completed, it turns out the actual mitigation costs paid were far closer to AmGUARD's assessment as to what should be paid compared to what Greystone contends was "undisputed" and should have been paid. The same is true of the estimated construction costs - which were ultimately far less than what Greystone contends were "undisputed" and should have been paid before repairs had even started. The record demonstrates AmGUARD's concerns that the mitigation and rebuild estimates were inflated were well-founded, which in turn confirms that AmGUARD did not breach the policy or commit bad faith in its handling of Greystone's claim.

These failures of proof are fatal to the Motion. Under Wisconsin law, both proof of a breach and damages must be shown in order to prevail on a claim for breach of contract. Moreover,

-2-

Greystone must prove a breach of the policy in order to establish bad faith, which must be shown by "clear and convincing evidence." Without this evidence, there is no basis for a summary judgment adjudication that AmGUARD breached the policy, much less committed bad faith. In that respect, Greystone has not and cannot meet its burden of proof on summary judgment.

As an evidentiary matter, virtually all of the 100 or so loose-leaf documents appended to Greystone's Proposed Findings of Fact in Support of its Motion are not authenticated and are inadmissible. Greystone's Motion also contains material "pop-up" facts that do not appear anywhere in the Plaintiff's Proposed Findings of Fact ("PPFF") in Support of its Motion. Although AmGUARD has attempted to address the merits of the arguments to the extent possible by incorporating by reference the same authenticated exhibits that were cited in AmGUARD's Motion for Summary Judgment, there are still numerous documents incorporated into Greystone's Motion that are unauthenticated and inadmissible. On this basis alone, the Court must deny the Motion.

Even if Greystone were able to cure these evidentiary deficiencies, summary judgment should still be denied on the merits because Greystone has not met its burden of demonstrating a breach, damages or bad faith. In the absence of such proof, Greystone's related claim for prejudgment interest fails as a matter of law. Given the appropriate legal standards, the facts, and the *admissible* evidence that has been presented, Greystone has not and cannot meet its burden on summary judgment. As a result, not only should the Court deny Greystone's Motion, but it can and should grant summary judgment in favor of AmGUARD for the reasons set forth in AmGUARD's Motion for Summary Judgment. (CM/ECF Doc. Nos. 50-51.)

-3-

## ARGUMENT

### Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue of material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Smith on Behalf of Smith v. Severn*, 129 F.3d 419, 425 (7th Cir. 1997). "Material facts are those under the applicable substantive law that 'might affect the outcome of the suit.'" *Kostal v. Life Ins. Co. of N. Am.*, 834 F. Supp. 2d 882, 884 (E.D. Wis. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute over 'material fact' is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.*

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To meet its initial burden, the moving party must make more than simple conclusory assertions to that effect. *Id*. "On a motion for a summary judgment the burden of establishing the nonexistence of any genuine issue of fact is upon the moving party, *all doubts are resolved against him,* and his supporting affidavits and depositions, if any, are carefully scrutinized by the court." *Rose v. Bridgeport Brass Co.*, 487 F.2d 804, 808 (7th Cir. 1973) (emph. in orig.)

If and only if Greystone carries its initial summary judgment burden does the onus shift to AmGUARD, in which case the Court must examine all the evidence in the light most favorable to AmGUARD and draw all inferences in its favor. *Haywood v. Lucent Technologies*, 323 F.3d 524 (7th Cir. 2003). Significantly, if the moving party fails to shoulder its initial burden—which Greystone undoubtedly has on all issues—the "non-moving party has no obligation to produce

-4-

anything," and the motion must be denied. *Yorger v. Pittsburgh Corning Corp.*, 733 F.2d 1215, 1218 (7th Cir. 1984).

## I.   GREYSTONE HAS FAILED TO MEET ITS BURDEN ON SUMMARY JUDGMENT OF PROVING THAT AMGUARD BREACHED THE AMGUARD POLICY OR THAT GREYSTONE SUSTAINED ANY RESULTING DAMAGES.

Greystone broadly asserts that "AmGUARD breached the insurance policy as a matter of law," but its Motion never explains how exactly it is AmGUARD breached the policy or which provisions AmGUARD purportedly breached.    Instead, Greystone vaguely suggests that AmGUARD breached the AmGUARD Policy because it took too long to prepare an appropriate estimate, that it "rejected the opinions" of its outside adjuster, Engle Martin, and its consultant J.S. Held, and failed to make timely payments under the policy. (Mot. at 4.)  But apart from a bullet point laundry list of purportedly "undisputed" facts, Greystone never connects the dots to establish how it is that AmGUARD breached the policy.

### A.   Greystone's Contention That AmGUARD Ignored Its Consultants Is Baseless.

Greystone, in conclusory fashion, initially contends that AmGUARD breached the policy because it "had information from day one that the reconstruction portion of the claim would exceed $500,000, and that by February 2019, AmGUARD was on notice that the value of the loss exceeded $1.2M."  (Mot. at 4-5.)  As noted in AmGUARD's Response to the PPFF, however, virtually all of these factual assertions are disputed and/or based on inadmissible evidence. (*See* AmGUARD's Response to the PPFF at ¶¶ 25, 28, 35, 41, 58, 61, 63, 64, 71, 73, 75, 107.)

For example, Greystone repeatedly references the fact that Engle Martin's reports to AmGUARD estimated the cost of reconstruction initially at or around $495,000 and later at $750,000, but this ignores Schmelling's testimony that these numbers were intended only as "placeholders," that he believed the number was less than $750,000 and that, ultimately, he

-5-

believed AmGUARD's assessment which calculated a Replacement Cost Value ("RCV") amount of $576,761.75 and an Actual Cost Value ("ACV") in the amount of $469,121.71 was reasonable. (*See* AmGUARD's Response to PPFF at ¶¶ 40, 41, 58, 64, 71; AmGUARD's Statement of Additional Proposed Findings of Fact in Support of its Response in Opposition to Plaintiff's Motion for Summary Judgment ("AmGUARD Additional SOF"), filed contemporaneously herewith, at ¶¶ 19-20.)

Greystone also contends that JS Held's Initial Estimate in the amount of $711,496.49 should have put AmGUARD on notice to pay this amount. However, Greystone fails to acknowledge that the JS Held Initial Estimate only provided a Replacement Cost Value estimate, and also fails to note the testimony of JS Held employee Chris Smith who testified that it is not unusual for insurers to further reduce JS Held-created estimates because JS Held typically does not have insurance policy information, the applicable bylaws and other material items. (*See* AmGUARD Additional SOF at ¶¶ 14-18.) That is precisely what occurred here when AmGUARD reduced the amount of the JS Held Initial Estimate to an Actual Cash Value amount to account for property and fixture depreciation. (*Id*. at ¶¶ 15-17.) Indeed, AmGUARD did not reduce or change the scope of the repair estimate in any manner, but instead made deductions based on its interpretation of the policy. (*Id*.)

Greystone's Motion also contends that AmGUARD should have known that construction costs would be higher based on a cover email to the JS Held Initial Estimate indicating that at the time of JS Held's second inspection, Units 2 and 3 were still investigation and it was not able to perform detailed take-offs nor had any demo occurred which would expose potentially damaged framing and components of the building. In other words, Greystone argues that AmGUARD

-6-

should have known that the JS Held Initial Estimate was incomplete and that it would ultimately take more money to complete the rebuild. This, however, fails to account for two key facts.

First, JS Held previously advised AmGUARD back on August 17, 2019, that its initial scope of repair would account for: (i) the gutting of Units 2-4, (ii) the replacement of the trusses over Units 2 and 3, (iii) the replacement of an additional 2-3 trusses. (*See* AmGUARD Additional SOF at ¶ 6.) As such, AmGUARD was aware and understood that the JS Held Initial Estimate would account for this additional work. Second, after the JS Held Initial Estimate was provided to AmGUARD, JS Held conducted a follow-up inspection of all of the all of the units, including Units 2 and 3, in order to determine whether additional demolition, scope and repairs were necessary on November 19, 2018. (*Id*. at ¶ 7.) JS Held did not issue a supplemental report or make any changes to the JSH Initial Estimate submitted to AmGUARD. (*Id*. at ¶ 8.) Accordingly, Greystone's contention that AmGUARD knew that construction costs would be substantially higher based on a purportedly "incomplete" JS Held Initial Estimate is demonstrably false.

Greystone also contends that AmGUARD should have known that the cost of construction would be substantially higher based on the Miller Estimate and JS Held's Supplemental Analysis of the Miller Estimate. The record, however, reflects that after receiving the Miller Estimate, AmGUARD requested that JS Held undertake a supplemental review and create a side-by-side comparison of the two documents so that AmGUARD could make an informed decision as to the cost of the rebuild. (*Id*. at ¶¶ 22, 24.) That, however, did not occur.

Rather, JS Held's Supplemental Analysis took several months to prepare (which Greystone conveniently fails to mention) and when it was received, it was determined to be insufficient and AmGUARD was unable to use it to make a fair assessment if the amount claimed in the Miller Estimate was reasonable. (*Id*. at ¶¶ 27-39.) As a result, Greystone's suggestion that AmGUARD

breached the policy because it did not accept the Miller Estimate on its face and should have relied on an incomplete analysis of that estimate is disingenuous and hardly constitutes a breach of contract.[1]

## B.    Greystone's Motion Fails to Account For Numerous AmGUARD Payments.

Greystone's Motion also contends that AmGUARD breached the policy because it failed to timely make payments to Greystone.  The record, however, flatly refutes this contention.

Greystone's Motion leaves out the fact that AmGUARD made numerous payments and advance payment offers to Greystone even before construction started in January 2019.  This includes a $150,000 advance payment offer on October, 17, 2018 and a $200,000 advance payment offer on October 31, 2018.  (*See* AmGUARD Additional SOF at ¶¶ 10-13.)  AmGUARD also made an ACV payment in the amount of $469,121.71 on December 20, 2018.  (*See* AmGUARD Response to the PPFF at ¶ 57.)  AmGUARD also offered Greystone a $50,000 advance payment on May 10, 2019, which Greystone rejected.  (*Id*. at ¶ 100.)  AmGUARD also attempted to make a payment to Greystone in the amount of $274,263.34 for the mitigation invoice, but Greystone rejected that payment.  (*Id*. at ¶ 74.)  Accordingly, any suggestion that AmGUARD failed to timely make payments under the policy is not true and is contradicted by the record.

Equally meritless is Greystone's contention that AmGUARD delayed making any payments after its ACV payment in December until September 2019.  As Greystone is well aware, Greystone did not provide AmGUARD with the Miller Estimate until February 2019, the JS Held review of that estimate took until May 13, 2019, and Greystone invoked appraisal on June 3, 2019, which process was not completed until August 13, 2019.  (*Id*. at ¶ 61; AmGUARD Additional SOF

---

[1] The Miller Estimate, which initially estimated the cost of repairs to be $1,518,847.97, was well in excess of what it actually cost to do the rebuild, $1,042,000.02 (*See* AmGuard Response to the PPFF at ¶ 61; AmGUARD's Additional SOF at ¶ 65.)  In that respect, AmGUARD's calculation that the rebuild project would cost $576,761.75 was closer than the Miller Estimate.  (*Id*. at ¶ 14.)

at ¶¶ 22, 40, 53.)  Within thirty (30) days of the appraisal award, AmGUARD paid all amounts that were owed, including the $972,323.60 unpaid difference in ACV amounts, which was received by Greystone on September 13, 2019. (*Id*. at ¶ 55.)  Greystone then later submitted a claim for the remaining RCV amount of $187,610.94, which was paid eleven days later on April 1, 2020. (*Id*. at ¶ 56.)

In sum, the record reflects that AmGUARD made numerous attempts to issue payments under the AmGUARD Policy, four of which were ignored or outright rejected.  Further, the record reflects that AmGUARD timely paid all amounts owed under the policy before and after the appraisal award was issued.  In contrast, Greystone has not presented any evidence that AmGUARD failed to timely make any payment under the AmGUARD Policy or that the time frame in which AmGUARD made payments under the policy was unreasonable.

### C.    The Mitigation Invoice Was Not Undisputed And Was Timely Paid.

Greystone's arguments regarding AmGUARD's analysis and payment of the mitigation invoice likewise are unsupported.  Once again, Greystone merely points to a laundry list of facts which it contends are "undisputed" with little to no analysis.  As demonstrated in AmGUARD's Response to the PPFF, virtually every single one of these factual propositions is disputed and/or relies on inadmissible evidence. (*See* AmGUARD Response to PPFF at ¶¶ 59, 64, 69, 70, 71, 85-88, 106, 109.)

For instance, Greystone focuses on a March 14, 2019 email indicating that Young and Associates ("Y&A") had completed its review of the CAT 5 mitigation invoice (such that it should have been paid at that time), but Greystone fails to mention that Y&A's report was not complete, Engle Martin ultimately disagreed with Y&A's conclusion, and the Y&A report was not provided to AmGUARD until April 29, 2019. (*See* AmGUARD Additional SOF at ¶¶ 43, 44.)  As a result,

-9-

Greystone's contention that the $352,000 amount was "undisputed" when Engle Martin believed that amount was not reasonable is belied by the record. This is further borne out by the fact that Greystone refused to pay the $352,000 invoice (despite being awarded $372,466.32 at appraisal) and instead paid $315,000. (*Id*. at ¶ 64.) This conclusively demonstrates that AmGUARD's determination that the $352,000 amount was not reasonable was a sound determination.

Greystone likewise contends that AmGUARD failed to pay the undisputed amount of $274,263.34 with respect to the CAT 5 mitigation invoice based on Cartagena's internal review, but Greystone again leaves out that it refused the proof of loss and payment that AmGUARD offered on May 17, 2019, instead electing to invoke the appraisal clause two weeks later. (*Id*. at ¶¶ 51, 53.) As a result, Greystone has failed to prove that AmGUARD breached the policy with respect to its review and payment of the mitigation invoice.

### D.   Greystone Fails to Offer Any Case Law To Support Its Contention That Disputed Amounts Must Be Paid.

For all of the cases cited in Greystone's Motion, it is remarkable that none of them hold that an insurer must pay amounts that are disputed, let alone pay those disputed sums within thirty (30) days. Yet that is precisely what Greystone contends in the Motion.

Greystone repeatedly asserts that AmGUARD had information in its possession that the total value of the claim would exceed $1M as of January 18, 2019 based on reports received from Engle Martin, JS Held and CAT 5. (Mot. at 7.) As previously discussed, these allegations are contradicted by the record. (*See* AmGUARD's Response to the PPFF at ¶¶ 25, 28, 35, 41, 58, 61, 63, 64, 71, 73, 75, 107.) By way of example, Engle Martin employee Keith Schmelling testified that he believed the loss was valued at or around $500,000 and that AmGUARD's analysis and, ultimately, that AmGUARD's reduction of the JS Held Initial Estimate to the amount of $576,761.75 for RCV and $469,121.71 for ACV was reasonable. (*See* AmGUARD Additional

SOF at ¶ 19.)  As a result, AmGUARD's payments through January 18, 2019, which totaled $469,121.71, which was paid to Greystone even before repairs had started, was reasonable and represented payment of all undisputed amounts owed at that time.

Greystone also asserts that AmGUARD breached the policy because it failed to timely notify Greystone of its coverage position, failed to provide copies of the JS Held Initial Estimate and JS Held Supplemental Estimate, and because it "attempted" to select a biased appraiser.  (Mot. at 16-17.)  Once again, the record evidence demonstrates otherwise.  As an initial matter, AmGUARD timely accepted coverage the day of the fire loss.  (*See* AmGUARD Additional SOF at ¶ 2.)  It is also undisputed that AmGUARD has never asserted any exclusion to coverage under the policy.  (*See* AmGUARD Response to the PPFF at ¶¶ 15, 16, 17.)  As for Greystone's contention it was not provided a copy of the JS Held Initial Analysis, that too is wrong.  The AmGUARD Estimate provided to Greystone on November 4, 2018 *is* the JS Held Initial Estimate, after applying depreciation and certain other deductions made by AmGUARD.  (*See* AmGUARD Additional SOF at ¶ 14, 15, 16, 17.)  As for Greystone's contention that AmGUARD breached the policy by inquiring whether Engle Martin had an appraisal department that could handle the appraisal (and was told that it could not accept the assignment), that hardly constitutes a breach of the policy and, in any event, Greystone fails to present any authority for this proposition.

Although Greystone contends that this case is similar to *Stingler v. Zurich Am. Ins. Co.*, 2014 WI App 108, ¶ 22, 357 Wis. 2d 604, 617, 855 N.W.2d 707, 713, that case involved an insurer's failure to timely pay a settlement agreement and does bear any resemblance to the facts of this case.  While Greystone argues that all insurers are under a statutory obligation to timely pay every insurance claim, that statement alone, without more, is meaningless.  Indeed, AmGUARD does not dispute that proposition as a general matter.  However, and pertinent here,

none of the cases in Greystone's Motion hold that an insurer must pay amounts that the insurer and/or the parties reasonably believe are in dispute and/or require further analysis.  (Mot. at 8-9.)

Greystone also argues that AmGUARD's tactic on this claim was to "delay, delay, delay," but the record once again tells a different story.  Indeed, it is undisputed that AmGUARD timely accepted coverage, hired multiple consultants within days of the fire who, in turn, conducted multiple inspections of the property.  (*See* AmGUARD Additional SOF at ¶¶ 2, 3, 5.)  AmGUARD also timely reviewed the JS Held Initial Estimate and timely made all payments as previously discussed above.  Although Greystone is critical that it took JS Held two months to prepare its initial estimate after the joint inspection, Greystone fails to mention that it took Miller *three months* to prepare the Miller Estimate.  Similarly, Greystone complains about the length of time that it took for AmGUARD to review the Miller Estimate, but it conveniently fails to mention that the reason for this was that JS Held took an atypical amount of time to prepare its supplemental analysis of the Miller Estimate.  (*Id*. at ¶¶ 22, 27-40.)

In sum, while Greystone complains that it took too long for AmGUARD to adjust this claim, it fails to point to anything that AmGUARD could have done to move the process along any faster.  Indeed, despite all of Greystone's complaints, it is undisputed that construction remained on track and was completed on time.[2] (*Id*. at ¶ 21.)  As a result, Greystone has not and cannot demonstrate there was a breach of the AmGUARD Policy due to any purported delay.

### E.     AmGUARD's Purported Breach of Certain Express Terms Of The Policy.

Greystone also contends that AmGUARD breached certain express provisions of the AmGUARD Policy, yet none of which contentions have merit or constitute a breach of contract.

---

[2] Greystone also contends that numerous witnesses, including AmGUARD witnesses, testified that "AmGUARD's delays in make payment and/or failure to follow the recommendations of its outside adjusters and experts was unreasonable."  This is a gross distortion of the testimony of these witnesses as set forth in AmGUARD's Response to the PPFF.  (*See* AmGUARD Response to the PPFF at ¶¶ 77, 93, 94, 105.)

First, Greystone contends that AmGUARD changed its coverage position regarding coverage for the interior of the units, but failed to communicate that change in position to Greystone. (Mot. at 16.) Specifically, Greystone notes that AmGUARD adjuster William Ardoline agreed in an email that certain interior finishes were covered. However, when AmGUARD adjuster Robert Cartagena subsequently reviewed the JS Held Initial Estimate, he was unaware that Ardoline had previously agreed that the interior finishes were uncovered and made deductions for some of these items based on his review of the condominium bylaws. (*See* AmGUARD Response to the PPFF at ¶ 50.) Although Greystone attempts to characterize this is a "change in coverage position," there is no such evidence that this was anything other than a difference in bylaw interpretation on the part of Cartagena who was unaware that Ardoline had taken a different position. That hardly constitutes a breach of contract, let alone a breach of any specific provision in the AmGUARD Policy, and Greystone fails to cite any authority for this proposition.

Second, Greystone contends that AmGUARD breached the AmGUARD Policy when it inquired as to whether Engle Martin had an appraisal department that could potentially serve as AmGUARD's appraiser. AmGUARD was informed that Engle Martin could not accept the representation and, accordingly, AmGUARD retained RGA Claims Management on June 6, 2019, just three days after receiving the letter invoking appraisal. Again, AmGUARD's inquiry, without more, does not amount to a breach of contract and Greystone fails to present any authority to back up this proposition.

Third, Greystone contends that AmGUARD breached the AmGUARD Policy by failing to provide it with copies of its consultant's internal reports, and vaguely claims that AmGUARD failed to provide it with "necessary claim forms, instructions and assistance to Greystone…."

-13-

(Mot. at 17.)  In particular, Greystone argues that it was a breach of contract for AmGUARD to provide proof of loss forms to Greystone in connection with payments that AmGUARD made under the policy.  None of these contentions have merit, let alone constitute a breach of the policy.

As an initial matter, Greystone fails to point out which provision in the AmGUARD Policy obligated AmGUARD to provide Greystone with its internal notes and consultants reports (because there is none).  Greystone's claim that it was a breach of the policy to provide proof of loss forms to Greystone in connection with payments made under the policy is also meritless.  As Greystone aware, the AmGUARD Policy contains the following condition precedent to payment of loss under the policy:

> **3.  Duties In The Event Of Loss Or Damage**
>
> > **a.**  You must see that the following are done in the event of loss or damage to Covered Property:
> >
> > > **(7)** Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.
>
> > **\*          \*          \***

(*See* AmGUARD Response to the PPFF at ¶ 1 at AMG-CF-GREYSTONE000530.)

Simply put, Greystone's suggestion that AmGUARD's reliance on a condition precedent to coverage under the Policy somehow constitutes a breach of the Policy is baseless.

### F.    Greystone Has Not Met Its Burden Of Proving Damages.

Greystone's Motion fails as a matter of law for the additional reason that it has not and cannot meet its burden of proving damages from any purported breach of the AmGUARD Policy. The lack of articulable damages is fatal to Greystone's breach of contract claim. *Brew City*, 2006 WI App 39, ¶ 11 (holding that actual damages are an essential element of a breach of contract claim).

Specifically, Greystone's Motion identifies two categories of damages: (1) costs it incurred in hiring Miller; and (2) costs it expended in connection with the appraisal. Neither of these expenses constitute "damages" for breach of contract. With respect to Greystone's claim that it is entitled to recover the costs it incurred in hiring Miller, there is nothing in the record to suggest that AmGUARD was in breach of the policy at the time Miller was hired, which occurred a mere twenty-eight (28) days after the fire occurred. (*See* AmGUARD Response to the PPFF at ¶ 31.) Indeed, Greystone's 30(b)(6) representative testified that the decision to hire Miller was because of a prior coverage dispute Greystone had with another property insurer, which led Greystone to seek representation immediately in the initial claim process. (*See* AmGUARD Additional SOF at ¶ 4.) As such, Greystone's decision to hire a public adjuster was a business decision. It was not a cost incurred because of a purported breach of contract.

Similarly, the cost of Greystone's "appraisal expenses" are not recoverable as damages. As discussed above, the appraisal clause in the AmGUARD Policy is a provision that was voluntarily invoked by Greystone. Not surprisingly, Greystone fails to cite any Wisconsin case law (or any authority for that matter) for the proposition that the mere invocation of an appraisal clause constitutes recoverable damages. Greystone's damages claim also conflicts with the plain language of the AmGUARD Policy, which unambiguously states that the costs of appraisal are to be borne by the respective parties:

> **2.   Appraisal**
>
> If we and you disagree on the amount of loss, either may make written demand for appraisal of the loss….
>
> Each party will:
>
> a.   Pay its own chosen appraiser; and
>
> b.   Bear the other expense of the appraisal and Umpire equally….

-15-

Thus, there is no factual or legal basis for Greystone's claim that it is entitled to recover its appraisal expenses as "damages" flowing from a breach of the AmGUARD Policy.

Lastly, even if Greystone's purported "damages" were recoverable (which they are not), the undisputed evidence demonstrates that Greystone has already been paid $257,056.23 *in excess* of what it cost to repair the property and pay the mitigation invoice. (*See* AmGUARD Additional SOF at ¶¶ 61-65.) That sum far exceeds any of Greystone's purported "damages." For all of these reasons, the Court should deny summary judgment with respect to Greystone's breach of contract claim.

## II.   GREYSTONE'S BAD FAITH CLAIM FAILS AS A MATTER OF LAW BECAUSE THE GREYSTONE'S CLAIM WAS AT ALL TIMES "FAIRLY DEBATABLE".

Greystone makes two arguments in support of its claim that AmGUARD acted in bad faith. First, it contends that there was no reasonable basis for AmGUARD's assertion that the undisputed ACV amount was $742,699.65 as of May 17, 2019. Second, Greystone contends that AmGUARD "suppressed or disregarded" unfavorable estimates in an effort to undervalue Greystone's claims. In short, Greystone has failed to substantiate either of these baseless assertions - and certainly has not met its burden of doing so by clear and convincing evidence.

### A.   Greystone's Motion Should Be Denied Because There Was No Breach.

Under Wisconsin law, in order to sustain a claim for bad faith, Greystone must first establish a breach of contract which, for the reasons detailed above, it has failed to do. *Brethorst v. Allstate Prop. and Cas. Ins. Co.*, 2011 WI 41, ¶ 65, 334 Wis. 2d 23, 798 N.W.2d 467 ("[S]ome breach of contract by an insurer is a fundamental prerequisite for a first-party bad faith claim against the insurer by the insured."). As a result, the Court need not address any of the arguments made by Greystone with respect to its "bad faith" claim. However, should the Court reach the

-16-

merits of Greystone's bad faith claim, AmGUARD submits that the Court should nevertheless deny Greystone's Motion.

**B.     AmGUARD's ACV Calculation Was Reasonable and Fairly Debatable.**

Greystone's Motion alleges that AmGUARD acted in bad faith based in large part, on a May 17, 2019 email that AmGUARD adjuster William Ardoline sent to Greystone advising that, because AmGUARD did not have sufficient information to complete its evaluation of the damages, it was prepared to conclude the ACV portion of the claim for $742,699.65, which included the amount previously paid of $469,121.71 for the rebuild, and $274,263.43 for the mitigation work.

Greystone asserts the email is bad faith because AmGUARD did not "solicit additional information from the insured to assist with its evaluation, advise the insured what information is still necessary, or identify the source of the supposed 'incomplete information' AmGUARD received." (Mot. at 24.)  Greystone further asserts the email constitutes bad faith because it failed to inform Greystone that JS Held had submitted a supplemental analysis that largely copied the Miller Estimate (less roughly $30,000) and that Y&A had recommended payment of the mitigation invoice in the amount of $352,000.  Neither of these contentions has merit and Greystone's Motion fails to properly analyze the issue of bad faith, *i.e.*, whether a reasonable insurer would not have calculated an initial estimate RCV amount of $576,761.75 and an ACV amount of $469,121.71, or calculated $274,263.43 for the mitigation work performed, such that coverage was not even fairly debatable.

As explained above, AmGUARD's calculations for RCV and ACV were based on JS Held's Initial Estimate, which did not change JS Held's scope of loss findings in any way and only included deductions for depreciation and other items that Cartagena believed were not covered. That alone makes the estimate reasonable and fairly debatable.  Although Greystone correctly

-17-

points out that the email did not explain what information it had not received to complete its analysis, Greystone fails to explain how this constitutes bad faith. AmGUARD's position was simply that it did not have enough information to increase its previous ACV payment. That position was therefore reasonable and fairly debatable.

Greystone's suggestion that AmGUARD disregarded the Miller Estimate and the JS Held Supplemental Analysis fails to consider that the reason that JS Held was retained a second time for precisely that reason: to conduct a side-by-side analysis of the AmGUARD Estimate and the Miller Estimate. As such, AmGUARD did not "discard" anything. Rather, it received a report that was inadequate for purpose it had been requested as AmGUARD adjusters William Ardoline and Robert Cartagena testified. (*See* AmGUARD Additional SOF at ¶¶ 45, 48.)

AmGUARD's analysis of the CAT 5 mitigation invoice was similarly reasonable. The CAT 5 invoice, on its face, was inherently unreasonable as it contained excessive supervisory billing, uncompensable equipment costs, and due to these improper additional amounts totaled close to half a million dollars – nearly half of what it cost for the entire rebuild. Even though Y&A was able to negotiate the invoice down to a "fair market value" amount of $352,000, Engle Martin informed AmGUARD that it still did not agree with this assessment and believed that a reasonable and fair price for the work performed was significantly less. (*Id*. at ¶ 42, 43.) AmGUARD's internal review agreed with Engle Martin and concluded that a reasonable amount for the work performed was $274,263.43. (*Id*. at ¶ 50.) Tellingly, Greystone ultimately agreed only to pay $315,000 to CAT 5, which definitively confirms that that the $352,000 sum was excessive and unreasonable. (*Id*. at ¶ 98.)

When an issue, whether a question of law or a question of fact, is fairly debatable, the insurer is entitled to debate it. AmGUARD has put forth a reasonable basis for the AmGUARD

-18-

Estimate and a reasonable basis for its valuation of the CAT 5 mitigation invoice and was entitled to debate those issues.  Greystone has therefore failed to prove, as a matter of law, by clear and convincing evidence, that AmGUARD acted in bad faith based on the record presented here.

        **C.**     **Greystone Is Not Entitled to Prejudgment Interest.**

As a final matter, Greystone asserts that it is entitled to prejudgment interest in the amount of $36,462.14.  This claim should be rejected for several reasons.  First and foremost, Greystone is not entitled to prejudgment interest because it has not met its burden on summary judgment with respect to its breach of contract claim or its bad faith claim.  Second, Greystone has failed to make the required showing under *Kontowicz v. Am. Standard Ins. Co. of Wisconsin*, 2006 WI 48.  Third, Greystone has failed to demonstrate that there was a "sum certain" amount due and owing with respect to the mitigation invoice or the estimated cost of repair as of January and February 2019 through September 2019.  Lastly, even if Greystone were entitled to prejudgment interest (which it is not), that amount has already been paid by AmGUARD because it overpaid the claim by $257,056.23, which amount Greystone has retained.

## CONCLUSION

For all the foregoing reasons, AmGUARD respectfully requests that the Court deny Greystone's Motion, grant summary judgment AmGUARD's favor on Counts I and II of Greystone's Complaint for the reasons set forth in AmGUARD's Motion for Summary Judgment, and for any such further other relief as the Court deems necessary.

Dated:  November 6, 2020                     Respectfully submitted,


                                             */s/ Craig A. Jacobson*
                                             Ryan T. Brown
                                             Craig A. Jacobson
                                             Geoffrey Repo
                                             Gordon Rees Scully Mansukhani LLP
                                             One North Franklin, Suite 800
                                             Chicago, IL 60606
                                             Telephone: (312) 980-6784
                                             Facsimile: (312) 565-6511
                                             *rtbrown@grsm.com*
                                             *craig.jacobson@grsm.com*
                                             *grepo@grsm.com*

                                             *Attorneys for AmGUARD Insurance*
                                             *Company*

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2020, a copy of the foregoing document was filed electronically.  Notice of this filing will be served on all parties of record by operation of the Court's electronic filing system.

/s/ Craig A. Jacobson
Craig A. Jacobson
Gordon Rees Scully Mansukhani LLP
One North Franklin, Suite 800
Chicago, IL 60606
Telephone: (312) 980-6784
Facsimile: (312) 565-6511
craig.jacobson@grsm.com

Attorneys for AmGUARD Insurance Company