**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

GREYSTONE CONDOMINIUM AT )
BLACKHAWK OWNERS ASSOCIATION, INC., )
                                        )
                     Plaintiff,           )     Case No.: 3:19-cv-00768-SLC
                                          )
       v.                                       )
                                          )
AMGUARD INSURANCE COMPANY,       )
                                          )
                 Defendant.       )

**DEFENDANT AMGUARD'S RESPONSE TO PLAINTIFF GREYSTONE'S PROPOSED
FINDINGS OF FACT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendant AmGUARD Insurance Company ("AmGUARD") submits the following

response to Plaintiff Greystone Condominium at Blackhawk Owners Association, Inc.'s

("Greystone" or "Plaintiff") Proposed Findings of Fact in Support of Motion for Summary

Judgment ("PPFF").[1]

**PARTIES**

1.      The plaintiff, Greystone Condominium at Blackhawk Owners Association, Inc.

("Greystone" or "Plaintiff") is a non-stock corporation organized under the laws of the State of

Wisconsin with its principal office located at 8309 Greenway Boulevard, Suite 220, Middleton,

Wisconsin 53562. (Doc. 1, Def.'s Notice of Removal, p. 2, ¶ 6.)

---

[1] As a preliminary matter, AmGUARD notes that many of the nearly 100 exhibits Greystone has appended to its motion are not properly authenticated by affidavit or other permissible means. In some instances, documents referenced in Greystone's motion are completely missing. These unauthenticated documents are inadmissible as evidence. *Pacific Cycle, Inc. v. PowerGroup Intern., LLC*, 969 F. Supp. 2d 1098 (W.D. Wis. 2013). ("To be admissible, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence") (citation omitted). Where Greystone relies on a document that was also submitted by AmGUARD together with AmGUARD's summary judgment motion, AmGUARD has incorporated those documents by reference. However, there remain numerous documents cited in Greystone's motion that are unauthenticated and inadmissible.

**RESPONSE:**  Not disputed.

2.      The defendant, AmGUARD Insurance Company ("AmGUARD" or "Defendant") is a foreign insurance company licensed to do business in the State of Wisconsin with a statutory home office located at 16 South River Street, Wilkes Barre, PA 18702.  (Id., p. 2, ¶ 7; Doc. 5, Def.'s Ans., p. 2, ¶ 2.)

**RESPONSE:**  Not disputed.

## JURISDICTION & VENUE

3.      The underlying insurance claim which is the subject matter of this action arose out of a fire and resulting damage to a condominium complex located, in part, at 703 Cricket Lane, Middleton, Wisconsin 53562.  (See generally Doc. 1, Ex. A, Compl., pp. 6-15.)

**RESPONSE:**  Not disputed.

4.      This Court has jurisdiction under 28 U.S.C. § 1332 as the amount in controversy exceeds $75,000 and arises between citizens of different states.  (Doc. 1, Def.'s Notice of Removal, pp. 2-3, ¶¶ 4, 9; Doc. 5, Def.'s Ans., p. 2, ¶ 3. See also PPFF ¶¶ 1-2, supra; ¶¶ 117-120, infra.)

**RESPONSE:**  Not disputed.

5.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(2) because the underlying insurance claim and events giving rise to this action occurred in Dane County, Wisconsin.  (See generally Doc. 1, Ex. A, Compl., pp. 6-15.)

**RESPONSE:**  Not disputed.

## THE FIRE LOSS

6.      On August 13, 2018, a fire occurred (the "fire") at 703 Cricket Lane, Middleton, Wisconsin 53562 ("Building 703").  (Greatsinger Aff., Ex. A, Sobel Dep. at 6:18-21, 9:12-20.)

**RESPONSE:** Not disputed.

7.      At all relevant times, Greystone owned and operated a condominium complex made up of eight separate building, including Building 703.  (Id. at 8:18-9:24, 12:8-20.)

**RESPONSE:** Not disputed.

8.      There were seven individual units inside Building 703, all of which were owned and occupied at the time of the fire.  (Id. at 172:7-173:17.)

**RESPONSE:** Not disputed.

9.      All of the residents in Building 703 were displaced from their homes as a result of the fire.  (Id.)

**RESPONSE:** Disputed, in part.  The resident living in Unit 7 was able to move back into Unit 7 the day after the fire occurred.  (*See* AmGUARD Insurance Company's Statement of Proposed Findings of Fact, CM/ECF Doc. No. 52 at ¶ 12 ("AmGUARD SOF ¶ __").)[2]

10.     As a result of the fire, Building 703 sustained significant structural damage, including, but not limited to, damage to the interior, exterior, and framing components of the building.  (Greatsinger Aff., Ex. B, Rankin Dep. at 42:2-43:1.)

**RESPONSE:** Disputed, in part.  The units in Building 1 sustained varying degrees of fire or water damage from fire suppression efforts, although Units 2 and 3 sustained the most amount of damage.  (*See* AmGUARD SOF at ¶ 12.)  Unit 7 had no damage and Unit 6 had only

---

[2] For ease of reference and to lessen the burden on the Court, the evidentiary materials cited in AmGUARD's Responses refers to those materials attached to AmGUARD's Statement of Proposed Findings of Fact previously filed with the Court.  (*See* CM/ECF Doc. Nos. 52-60.)

minimal smoke damage. (*Id*.)

## THE INSURANCE CONTRACT

11. At all relevant times, AmGUARD issued a "BizGUARD Plus" insurance policy (the "policy") to Greystone, Policy No. GRBP945426, that provided coverage for damage to Building 703, among others. (Greatsinger Aff., Ex. C, Def.'s Resps. to Pl.'s Second Set of Reqs. for Prod., p. 6, Request No. 7, pp. BATES 7378-509; Ex. D, Def.'s Resps. to First Set of Reqs. for Admissions, p. 1, Request No. 1.)

**RESPONSE:** Disputed, in part. The copy of the AmGUARD Policy referenced in Paragraph 11 and attached as part of Exhibit C to the Greatsinger Affidavit is not properly authenticated and is therefore inadmissible. Notwithstanding, AmGUARD incorporates by reference the AmGUARD Policy attached as Exhibit 1 to AmGUARD's SOF at ¶¶ 8-10.

AmGUARD issued Comprehensive Business Owners Policy No. GRBP945426 to Greystone for the period of May 1, 2018 through May 1, 2019 providing, *inter alia*, first party coverage for the Greystone Condominium Development, subject to certain terms and conditions precedent to coverage. (*Id.*)

12. The policy was in effect at the time of the fire. (Greatsinger Aff., Ex. C, Def.'s Resps. to Pl.'s Second Set of Reqs. for Prod., p. 6, Request No. 7, pp. BATES 7381-393. Ex. D, Def.'s Resps. to First Set of Reqs. for Admissions, p. 1, Request No. 2.)

**RESPONSE:** Not disputed.

13. The building coverage policy limits applicable to Building 703 were $2,275,342.00. (Greatsinger Aff., Ex. C, Def.'s Resps. to Pl.'s Second Set of Reqs. for Prod., p. 6, Request No. 7, p. BATES 7382.)

**RESPONSE:** Disputed, in part. The applicable limit is $2,275,352. (*See* AmGUARD's

SOF at ¶ 9.)

14.    The policy provided an initial grant of coverage for damage to Building 703

caused by the fire.  The relevant initial grant of coverage reads:

### SECTION I – PROPERTY

#### A. Coverage
We will pay for direct physical loss of or damage to Covered Property at the
premises described in the Declarations caused by or resulting from any
Covered Cause of Loss.

[...]

#### 3. Covered Causes of Loss
Risks of direct physical loss unless the loss is:
a.  Excluded in Paragraph B.  Exclusions in Section I; or
b.  Limited in Paragraph 4.  Limitations in Section I.

(Id., pp. BATES 7453-454, emphasis added; BATES 7428-429; Greatsinger Aff., Ex. D, Def.'s

Resps. to First Set of Reqs. for Admissions, p. 2, Request No. 5.)

**RESPONSE:**  Not disputed.

15.    There is no exclusion in the policy for damage caused by the fire.  (Greatsinger

Aff., Ex. C, Def.'s Resps. to Pl.'s Second Set of Reqs. for Prod., p. 6, Request No. 7, pp. BATES

7466-472.)

**RESPONSE:**  Not disputed.

16.    There is no limitation in the policy for damage caused by the fire.  (Id., pp.

BATES 7454-455.)

**RESPONSE:**  Not disputed.

17.    AmGUARD admits the policy covers direct physical loss of or damage to

Building 703 caused by fire.  (Greatsinger Aff., Ex. D, Def.'s Resps. to First Set of Reqs. for

Admissions, p. 2, Request No. 5.)

**RESPONSE:**  Not disputed.

18.     AmGUARD admits Greystone complied with all necessary and relevant policy

conditions and requirements.  (Id., p. 2, Request No. 3.)

**RESPONSE:**  Not disputed.

19.     In the event of a covered property loss, such as the one caused by the fire,

AmGUARD agreed to make payment as follows:

### E. Property Loss Conditions

[...]

**2.  Appraisal**
If we and you disagree on the amount of loss, either may make written demand for an appraisal of the loss.  In this event, each party will select a competent and impartial appraiser. [...]

**3.  Duties In The Event Of Loss Or Damage**
**a.** You must see that the following are done in the event of loss or damage to Covered Property:

[...]

(2) Give us prompt notice of the loss or damage.  Include a description of the property involved.
(3) As soon as possible, give us a description of how, when and where the loss or damage occurred.

 [...]

(6) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

[...]

(7) Send us a signed, sworn proof of loss containing the information we request to investigate the claim.  You must do this within 60 days after our request.  We will supply you with the necessary forms.

[...]

### 5. Loss Payment

In the event of loss or damage covered by this policy:

> [...]
>
> b.   We will give notice of our intentions within 30 days after we receive the sworn proof of loss.
>
> [...]
>
> g.   We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, provided you have complied with all of the terms of this policy; and
>
> (1)   We have reached agreement with you on the amount of the loss; or
> (2)   An appraisal award has been made.

(Greatsinger Aff., Ex. C, Def.'s Resps. to Pl.'s Second Set of Reqs. for Prod., p. 6, Request No.

7, p. BATES 7473-476.)

**RESPONSE:** Not disputed.

20.   The policy also includes a Wisconsin Changes endorsement which amends the

policy to conform with any Wisconsin statute or rule, including those promulgated by the

Commissioner of Insurance and published in the Wisconsin Administrative Code. (Id., p.

BATES 7408.)

**RESPONSE:** Not disputed.

**ADJUSTMENT OF THE LOSS**

21.   At the time of the fire, on August 13, 2018, Greystone's insurance agent arrived

on the scene and reported the fire to AmGUARD. (Greatsinger Aff., Ex. A, Sobel Dep. at 39:8-

42:16, 49:5-12; Greatsinger Aff., Ex. E, Def.'s Resps. to Pl.'s First Set of Reqs. for Prod., p. 4,

Request No. 1, p. BATES 7200.)

**RESPONSE:** Not disputed.

22.   AmGUARD acknowledged notice of the claim that same day and assigned

William Ardoline ("Ardoline") as its desk adjuster. (Greatsinger Aff., Ex. E, Def.'s Resps. to

Pl.'s First Set of Reqs. for Prod., p. 4, Request No. 1, pp. BATES 7200.)

**RESPONSE:**  Disputed, in part.  AmGUARD states that the AmGUARD claim notes attached at BATES 7200 to the Greatsinger Affidavit are not properly authenticated and are therefore inadmissible.

Notwithstanding, AmGUARD incorporates by reference the AmGUARD claim notes attached as Exhibit 5 to AmGUARD's SOF at ¶ 13.

23.     AmGUARD retained Engle Martin's Keith Schmelling ("Schmelling") to act as its outside adjuster.  (Id., pp. BATES 7199-7200.)

**RESPONSE:**  Not disputed.  (*See* AmGUARD SOF at ¶ 14.)

24.     AmGUARD also retained J.S. Held to "write up a fire damage repair and water mitigation scope and price." (Greatsinger Aff., Ex. E, Def.'s Resps. to Pl.'s First Set of Reqs. for Prod., p. 4, Request No. 1, pp. BATES 1771-772.)

**RESPONSE:**  Disputed, in part.  AmGUARD states that the document attached to the Greatsinger Affidavit at BATES 1771-1772 is not authenticated and is therefore inadmissible.

Notwithstanding, AmGUARD incorporates by reference the August 14, 2018 email communications attached to AmGUARD's SOF ¶ 18, Exhibit 10, as if set forth in full.

25.     On August 14, 2018, Schmelling inspected Building 703 and advised Ardoline his "rough estimate is about $500,000.00 (could be more) for structurally rebuilding 2 whole units and gutting 2 other units." (Id., p. BATES 7199.)

**RESPONSE:**  Disputed, in part.  The quoted language appears to be a summary of a telephone conversation that was recorded in the AmGUARD's claim notes and is inadmissible

hearsay.  (*See* AmGUARD SOF ¶ 13, Exhibit 5 at AMG-CF-GREYSTONE0007199).

26.     AmGUARD did not provide claim forms such as a proof of loss or instructions to Greystone within 10 days after AmGUARD was first notified of the claim.  (Id., pp. BATES 3401-408.)

**RESPONSE:**  Not disputed.  (*See* AmGUARD SOF at ¶ 13, Exhibit 5.)

27.     On September 1, 2018, Schmelling advised J.S. Held he had reviewed the condominium bylaws and declarations and determined AmGUARD insurers all interior building repairs and replacements to original construction, stating, "[a]t this point in time, I do not know what the original builder's grade construction was at this location in 2004.  I suspect it was sheet vinyl and carpet.  The remainder of these items were probably the same as seen during your inspection." (Id., p. BATES 2482.)

**RESPONSE:**  Disputed.  The document attached to the Greatsinger Affidavit bearing BATES 2482 does not support the factual assertions set forth in Paragraph 27.  That document appears to be a partial email communication dated May 14, 2019.  (*Compare* Exhibit E at BATES 2482 *with* AmGUARD SOF at ¶ 99, Exhibit 69.)

28.     On September 4, 2018, Schmelling provided his first report to AmGUARD advising that his estimate of the damages at that time was $495,000.00 before confirming "what the original construction is for this building." (Id., pp. BATES 5765-773.)

**RESPONSE:**  Disputed.  AmGUARD states that the document attached to the Greatsinger Affidavit at BATES 5675-773 is not authenticated and is therefore inadmissible.  In addition, AmGUARD states that even if Greystone is able to authenticate the document,

AmGUARD is unable to confirm the language quoted above is contained in this document.

29.     In the first 30 days after the fire, AmGUARD never communicated to Greystone the coverage position settled on after Schmelling's review of the condominium bylaws and declarations.  (Greatsinger Aff., Ex. A, Sobel Dep., pp. 78:7-82:23.)

**RESPONSE:**  Disputed.  Upon receiving notice of the fire loss, AmGUARD timely accepted coverage, assigned a claim number and hired Engle Martin to adjust the loss, all of which was communicated to Greystone and its insurance agent.  (*See* AmGUARD SOF at ¶ 14.)

30.     It took AmGUARD more than 30 days to confirm whether and to what extent various elements inside and outside the individual units were covered under the policy.  (Id.)

**RESPONSE:**  Disputed.  AmGUARD timely accepted coverage on the day the fire loss was reported; however, the process of adjusting the claim to ultimately determine was an ongoing process that took months to adjust.  (*Id*.)

31.     On September 11, 2018, Greystone hired Miller Public Adjusters ("Miller") as its public adjuster because it was concerned about AmGUARD's delay in confirming or denying coverage.  (Id., pp. 78:19-79:19.)

**RESPONSE:**  Disputed, in part.  AmGUARD does not dispute that less than thirty (30) days after the fire, Miller was retained on or around September 11, 2018.  However, AmGUARD disputes that Miller was retained because it was concerned about AmGUARD's delay in confirming or denying coverage.  AmGUARD accepted coverage the day the fire loss occurred.  (*See* AmGUARD SOF at ¶ 14.)  Moreover, Greystone's 30(b)(6) witness testified that Miller was retained because of an insurance dispute Greystone had with a different insurance carrier a

year earlier.  (*See* Greatsinger Aff., Exhibit A, Sobel Dep. at 18:12-19:4.)

32.     On September 19, 2018, Schmelling emailed Ardoline, stating, "There is no way

to advise you of a reasonable advance at this point until we get the initial DRAFT line item scope

and price from [J.S. Held]." (Greatsinger Aff., Ex. E, Def.'s Resps. to Pl.'s First Set of Reqs. for

Prod., p. 4, Request No. 1, pp. BATES 2005-006.)

**RESPONSE:**  Disputed, in part.  AmGUARD states that the document attached to the

Greatsinger Affidavit at BATES 2005-0006 is not authenticated and is therefore inadmissible.

Notwithstanding, AmGUARD incorporates by reference the September 19, 2018 email

attached to AmGUARD's SOF at ¶ 38, Exhibit 24.

33.     In that same communication, Schmelling asked Ardoline:

> In the meantime, can you clarify your coverage statement you made to the
> Public Adjuster.  You indicated the coverage is walls out, but then
> discussed replacing finishes back to original construction.  Walls out
> typically refers to just the drywall with no finishes and Mr. Miller is
> feeling your statements are contradictory.
>
> I think it is fair to say, what the coverage position is on this claim is the
> following:
>
> The master policy the association has with GUARD covers ceiling, wall
> and floor finish out, which includes trim work as well.  The quality of the
> finish is equivalent to what existed at the time of the original construction.
> In this case, paint, carpet and some vinyl sheet flooring throughout.
>
> If you agree with the coverage statement above [Ardoline], please advise
> via reply email and I will advise [J.S. Held] and [Miller].

To which Ardoline replied, "Agreed Keith." (Id.)

**RESPONSE:**  Not disputed.  (*See* AmGUARD's SOF at ¶ 38, Exhibit 24.)

34.     On October 1, 2018, Schmelling contacted J.S. Held requesting, "please give me a

status as to when you anticipate having the scope and estimate to our office." (Id., p. BATES

2489.)

**RESPONSE:**  Disputed.  AmGUARD states that the document attached to the

Greatsinger Affidavit at BATES 2489 does not support the factual proposition for which it is

asserted.  In addition, AmGUARD states that the document attached to the Greatsinger Affidavit

at BATES 2489 is not authenticated and is therefore inadmissible.

35.     On October 12, 2018, J.S. Held provided its draft scope and estimate to

Schmelling in the amount of $711,496.49 replacement cost value ("RCV"), stating:

> Please find the Preliminary JS Held scope of work for the repair portion of
> the project for Greystone Condominiums in Middleton, WI.  Please note
> that at the time of the last inspection, Unit #2 and #3 were still under
> investigation and JS Held was not able to perform detailed take-offs nor
> had any of the demo occurred which would expose potentially damaged
> framing and components of the building. [...]
>
> It is my intention to re-visit the property after the demo is 100%
> completed in both units 2 and 3 to inspect the framing to determine if the
> current scope attached needs to be revised to account for additional work.

(Id., pp. BATES 212-13.)

**RESPONSE:**  Disputed, in part.  AmGUARD states that the document attached to the

Greatsinger Affidavit at BATES 212-13 in is not authenticated and is therefore inadmissible.

Notwithstanding, Greystone incorporates by reference the October 12, 2018 email

attached to AmGUARD's SOF at ¶ 24, Exhibit 17, as if set forth in full.

36.     AmGUARD did not note the above information from J.S. Held in its claim notes.

(Id., pp. BATES 3383-408.)

**RESPONSE:**  Disputed.  AmGUARD adjustor William Ardoline did not note receipt of

the email referenced in Paragraph 35 in his claim notes, however, he testified that not every

email communication is logged in the claim notes and that all email communications are

included in and made part of the electronic claim file.  (See Greatsinger Aff., Ex. G, Ardoline

Dep., at 29:11-18.)

37.     AmGUARD did not provide the above information from J.S. Held to Greystone or Miller.  (Id., pp. BATES 202-03.)

**RESPONSE:**  Disputed, in part.  AmGUARD did not provide a copy of the October 12, 2018 email from JS Held to Ardoline to Greystone, however, AmGUARD did provide the JS Held Initial Estimate to Miller and Greystone, less depreciation and certain other deductions. (*See* AmGUARD SOF at ¶ 35-37.)

38.     Instead, on October 17, 2018, Ardoline sent Miller a "Sworn Statement in Proof of Loss" form for $150,000.00 with no other explanation or instructions.  (Id., pp. BATES 188-89.)

**RESPONSE:**  Disputed, in part.  AmGUARD spoke with Michael Cygan from Miller and advised him that a $150,000 advance payment would be forthcoming, which was confirmed in an email dated October 17, 2018 together with a proof of loss specifically indicating that the $150,000 amount was an "advance" payment.  (*See* AmGUARD SOF at ¶¶ 28-29.)

39.     On October 25, 2018, Miller requested a copy of J.S. Held's draft scope and estimate from Ardoline who responded, "I am working on reviewing the J.S. Held estimate.  In the essence of time, as you have suggested, I request you work on preparing an estimate for what you saw and feel is needed so that when we are able to share the J.S. Held estimate with you both estimates will be readily available for comparison and discussion." (Id., pp. BATES 202-03.)

**RESPONSE:**  Disputed, in part.  AmGUARD states that the document attached to the Greatsinger Affidavit BATES 202-03 is not authenticated and is therefore inadmissible.

Notwithstanding, AmGUARD incorporates by reference the October 25-26, 2018 emails attached to AmGUARD's SOF at ¶ 34, Exhibit 21.

40.     On October 29, 2018, Schmelling requested his employer, Engle Martin, increase the reserves on the claim from $500,000.00 to $750,000.00 based on J.S. Held's draft scope and estimate.  (Greatsinger Aff., Ex. F, Schmelling Dep., pp. 86:3-25; Schmelling Doc. Prod., pp. BATES 2688-691.)

**RESPONSE:**  Disputed.  Schmelling testified that the $750,000 amount was a "placeholder" and that he believed the loss would be that amount or less.  (*See* Greatsinger Aff., Ex. F, Schmelling Dep., 86:21-87:16.)  In addition, AmGUARD states that there is no document bearing BATES 2688-691 attached to the Greatsinger Affidavit.

41.     The next day, on October 30, 2018, Schmelling provided his second report to Ardoline in which he estimated the loss at $750,000 and recommended immediate payment of $553,712.21 "based on the undisputed replacement cost value building loss in the amount of $711,496.49, less the $2,500.00 per occurrence policy deductible and recoverable depreciation of $155,798,02." (Greatsinger Aff., Ex. E, Def.'s Resps. to Pl.'s First Set of Reqs. for Prod., p. 4, Request No. 1, pp. BATES 4111-119.)

**RESPONSE:**  Disputed.  Schmelling testified that the $750,000 amount was a "placeholder" and that he believed the loss would be that amount or less.  (*See* Greatsinger Aff., Ex. F, Schmelling Dep., 86:21-87:16.)  AmGUARD states that the document attached to the Greatsinger Affidavit bearing BATES 4111-119 is not authenticated and is therefore inadmissible.

42.     AmGUARD did not follow Schmelling's recommendation to pay the undisputed ACV of $553,712.21.  (Greatsinger Aff., Ex. F, Schmelling Dep. at 71:1-72:13.)

**RESPONSE:** Not disputed.

43. On October 31, 2018, Miller again requested a copy of J.S. Held's draft scope and estimate from Ardoline who responded, "My colleague Bob Cartagena is reviewing the ESX file – an insurance claims estimate created using Xactimate software – from JS Held. In the meantime please see the attached proof of loss for an advance of $200,000." (Greatsinger Aff., Ex. E, Def.'s Resps. to Pl.'s First Set of Reqs. for Prod., p. 4, Request No. 1, p. BATES 221.)

**RESPONSE:** Disputed, in part. AmGUARD states that the document attached to the Greatsinger affidavit at BATES 221 is not authenticated and is therefore inadmissible.

Notwithstanding, AmGUARD incorporates by reference the October 31, 2018 email attached to AmGUARD's SOF at ¶ 31, Exhibit 20, as if set forth herein.

44. AmGUARD gave no further explanation or instruction about the purpose or basis for the $200,000 proof of loss or how it related to the estimated value of the reconstruction costs. (Id.)

**RESPONSE:** Disputed. AmGUARD informed Miller in the October 31, 2018 email and attached proof of loss that the $200,000 amount was an "advance" payment. (*See* AmGUARD SOF at ¶ 31.)

45. On November 2, 2018, Miller followed up for a timetable on AmGUARD's review of the ESX file from J.S. Held to which Ardoline replied, "it will take some time to review each line item." (Id., pp. BATES 408-09.)

**RESPONSE:** Disputed, in part. AmGUARD states that the document attached to the Greatsinger affidavit at BATES 408-09 is not authenticated and is therefore inadmissible.

46. During that same communication, Miller demanded AmGUARD release payment for the undisputed actual cash value ("ACV"). (Id.)

**RESPONSE:**  Disputed, in part.  AmGUARD states that the document attached to the Greatsinger affidavit at BATES 408-09 is not authenticated and is therefore inadmissible.

47.   Instead of paying the undisputed ACV, AmGUARD had Bob Cartagena ("Cartagena") review J.S. Held's draft scope and estimate.  (Id., p. BATES 221.)

**RESPONSE:**  Disputed.  There was no undisputed ACV amount at that time because AmGUARD had not yet accounted for depreciation and whether other items included in JS Held's estimate were covered under the AmGUARD Policy.  (*See* AmGUARD SOF at ¶¶ 33, 35-38.)  Moreover, Christopher Smith of JS Held testified that it is not unusual for JS Held's clients to make further reductions, as AmGUARD did, based on the insurance policy, bylaws and other items, which JS Held typically does not have.  (*See* AmGUARD SOF at ¶ 39.)

48.   Importantly, nobody from AmGUARD including Ardoline and Cartagena ever personally visited the scene to inspect the damage.  (Greatsinger Aff., Ex. G, Ardoline Depo., P. 57: 2-12.) The persons who had personally inspected the property – Schmelling and J.S. Held – agreed the total value of the reconstruction exceeded $700,000 (Id.)

**RESPONSE:**  Disputed, in part.  AmGUARD does not dispute that Ardoline and Cartagena did not personally visit the scene to inspect the damage, however, they testified that they did not need to because they relied on the scope of repair recommended by JS Held, which was accepted by AmGUARD.  (*See* AmGUARD SOF at ¶ 36.)

49.   AmGUARD's eventual appraiser, Jeff Weigen ("Weigen") testified he never met anyone who could come up with a reconstruction estimate without actually visiting the scene:

```
23              You said that you assumed Bob from AmGUARD
24         went and viewed the site before coming up with his
25         estimate.  Why do you assume that?
```

-16-

```
1                      MR. JACOBSON:   Object to form,
2           foundation.
3    A.  How can you write an estimate without looking at
4        it?
5    Q.  He never went to the site.
6    A.  I have no idea what he did.
7    Q.  He didn't.
8    A.  Okay.
9    Q.  Never went to the site.   Sat in his office on the
10       East Coast.
11          And it's your testimony that you can't write
12       an estimate without going to the site.   Fair?
13                      MR. JACOBSON:   Object to form,
14           foundation, incomplete hypothetical.
15   A.  Well, maybe some people can, but I would have to
16       go to it.
17   Q.  Have you met anyone in your, you know, 30-some
18       years of doing this who could sit at their desk
19       and write an estimate without -- on a loss this
20       large without going out to the loss site?
21   A.  I don't believe I have.
```

(Greatsinger Aff., Ex. H, Weigen Dep., pp. 124:23-125:21.)

**RESPONSE:**  Not disputed.

50.     Ardoline never told Cartagena about the coverages he agreed to (to bring the units back to their original construction) or the fact that J.S. Held's draft scope and estimate was incomplete because at least two of the units were still under investigation at the time of its initial inspection and demolition had not yet been completed:

ROBERT CARTAGENA 06/11/2020        Page 18..21

Page 18

1    estimate that this is referring to?
2          MR. GRAFF:  Yes.
3          THE WITNESS:  Okay.  So what's
4    your question?  I'm sorry.
5    BY MR. GRAFF:
6    Q    That's the one that you reviewed and did your
7    own analysis of, fair?
8    A    Fair.
9    Q    That estimate, for your information, can be
10   found at Bates 1475 to 1663, okay?
11   A    Okay.
12   Q    And if you need to reference that at all, go
13   right ahead.  My question is did that J.S. Held
14   estimate -- was it limited in any way based
15   upon the fact that Units 2 and 3 were still
16   under investigation and J.S. Held was not able
17   to perform detailed take-offs nor had any demo
18   occurred which would potentially expose damaged
19   framing and components?  Did that limit their
20   estimate in any way?
21         MR. JACOBSON:  Objection to form and
22   foundation.  Bob, you can answer if you can.
23         THE WITNESS:  This is the first time
24   I'm seeing this e-mail, and the estimate that
25   was presented to me to review, I was not aware

Page 19

1    that these units were not included.
2    BY MR. GRAFF:
3    Q    You thought you were dealing with an estimate
4    that encompassed all units?
5    A    That is my understanding, yes.
6    Q    Well, that -- well, that was your understanding
7    at the time --
8    A    Yes.
9    Q    -- at the time you did your work, right?
10   A    Yes.
11   Q    But now you understand the J.S. Held estimate
12   was not complete because it did not involve
13   Units 2 and 3?
14         MR. JACOBSON:  Objection to form and
15   foundation.  Bob, you can answer if you can.
16         THE WITNESS:  My answer is yes.
17   BY MR. GRAFF:
18   Q    That you did not understand that at the time
19   you did your work?
20         MR. JACOBSON:  Objection to form and
21   foundation.
22         THE WITNESS:  At the time I performed
23   the review of the estimate, I reviewed the
24   estimate that was provided to me by
25   Mr. Ardoline.  I was asked to review that

Page 20

```
1     estimate, and that estimate only.  I wasn't
2     given any other details regarding the loss,
3     just the estimate.
4  BY MR. GRAFF:
5  Q   Yeah, and, sir, I'm – don't take this the
6     wrong way.  I'm not blaming you, but do you
7     feel that this is an e-mail that should have
8     been provided to you?
9          MR. JACOBSON:  Objection to form and
10    foundation.
11         THE WITNESS:  I would have liked to
12    have known this, yes.
13  BY MR. GRAFF:
14  Q   You would have liked to have known this because
15    if J.S. Held is saying, "Our estimate isn't
16    complete," that means your estimate based upon
17    the J.S. Held estimate cannot be complete,
18    fair?
19          MR. JACOBSON:  Objection to form and
20    foundation.
21         THE WITNESS:  Fair.
22  BY MR. GRAFF:
23  Q   And by not complete, it's not an accurate
24    representation of the cost to reconstruct the
25    buildings?
```

(Greatsinger Aff., Ex. I, Cartagena Dep., pp. 18:23-20:21, emphasis added.)

**RESPONSE:**  Disputed in part.  AmGUARD does not dispute that Cartagena was not

informed about the scope of insurance coverage that Ardoline previously agreed to in an email

with Schmelling.  (*See* AmGUARD SOF at ¶ 38.)  However, AmGUARD disputes the factual

assertion that "J.S. Held's draft scope and estimate was incomplete because at least two of the

units were still under investigation at the time of its initial inspection and demolition had not yet

been completed."  AmGUARD was informed early on that Units 2 and 3 were going to be

completely gutted, including the trusses over those units and the replacement of additional

trusses as well.  (*Id*. at ¶ 20.)  In addition, JS Held informed AmGUARD that it would re-inspect

Units 2 and 3 to determine whether JS Held's initial estimate needed to be revised, which

inspection took place on November 19, 2018 and resulted in no changes to the initial estimate.

(*Id*. at ¶¶ 26-27.)  As a result, the JS Held Initial Estimate was not "incomplete" as asserted

herein.

51.     On November 4, 2018, Cartagena emailed Ardoline the results of his review and

reductions to J.S. Held's draft scope and estimate (again not knowing that Ardoline had already

agreed on certain coverages that were owed to the insured–such as for floor coverings and

interior finishing back to original construction–and not knowing J.S. Held's estimate was

incomplete):

Bill:

As requested, I have reviewed the estimate of repair submitted for this Condo Fire by JS Held **totaling $711,496.49 RCV.**  Upon initial review it was noted that no depreciation was applied.

A review finds the structure was built in 2005 and thus 13 years old.  I also reviewed the COA By-laws and Master deed and draw your attention to Article III "UNITS" located on page iii6; 3.02 (1) Description.  It reads in part "The exterior boundaries of the cubicles shall be the underlined interior surface of the perimeter wall surroundings......unfinished lower surface of ceiling of the highest story.......uncovered or unfinished upper surface of the floor of the lowest story.

Under sections (2) & (3)—all appliances are common, all electrical fixtures are common, as well as, all amenities.

Given the above, we have allowed for all walls, insulation, framing, cabinets, plumbing fixtures, windows, doors and appliances.  However, we removed any and all materials and labor associated with painting or staining.  Likewise, we removed all floor coverings, i.e vinyl & carpeting as these items are part the responsibility of the respective unit owners.

*** I also noted the email of Bill Farrey *Field Claims Representative for* owner of unit 6 of this building – Melissa Frank.  He claims that the Guard policy would be primary over the Ms. Frank's unit owner policy.  That is inaccurate.  Each policy is primary for the respective elements each party is to insure.  Unit owner's policies would be responsible for all paint, flooring coverings, trim paint, window treatments, etc.

Based on these parameters, I adjusted the evaluation as follows:

- Given the 13 year age. 20% depreciation was applied across the board for structural replacements
- 30% depreciation was applied to all mechanicals and appliances, as well as, bathroom fixtures.  Same was also applied to siding & roofing.
- All paint & floor covering removed
- All masking charges removed, as well as, all charges for final cleaning.
- Supervision was removed
- All painting to walls and interior trim were removed, with the exception of exterior doors, which were treated as common elements.

Summary for Building
Line Item Total 471,236.94
Material Sales Tax 9,277.49
Services Mat'l Tax 3.34
Subtotal 480,517.77
Overhead 48,052.37
Profit 48,052.37
Service Sales Tax 139.24
Replacement Cost Value $576,761.75
Less Depreciation (105,825.44)
Actual Cash Value $470,936.31
Less Deductible (2,500.00)
Net Claim $468,436.31
Total Recoverable Depreciation 105,825.44
Net Claim if Depreciation is Recovered $574,261.75

As always—call me with any ?s.  I'll be at my desk in AM Monday, then out in the field in the afternoon.

(Greatsinger Aff., Ex. E, Def.'s Resps. to Pl.'s First Set of Reqs. for Prod., p. 4, Request No. 1, pp. BATES 3143-144.) Cartagena's estimate was inconsistent with and narrower in covered scope than what Ardoline and Schmelling had already communicated to the insured and their own expert, J.S. Held, would be covered.  (Id.; PPFF, ¶ 33, supra.) It was also inconsistent with every estimate that had been prepared by someone who actually visited and inspected the property.  (PPFF, ¶¶ 35, 41 and 48, supra.)

**RESPONSE:**  Disputed, in part.  Paragraph 51 contains multiple improper arguments as opposed to a single factual proposition and should be stricken.  AmGUARD further states that the document referenced in Paragraph 51 is not authenticated and is inadmissible. Notwithstanding, AmGUARD incorporates by reference the November 4, 2018 email which is attached to AmGUARD's SOF at ¶ 35, Exhibit 22.

AmGUARD does not dispute that Cartagena's estimate was narrower in coverage than what Ardoline had previously advised, but this is because he was unaware that Ardoline had agreed those items were covered.  (*Id.* at ¶ 38.)  AmGUARD disputes the factual proposition that JS Held's Initial Estimate was incomplete for the reasons explained above in AmGUARD's Response to Paragraph 50.

52.     Ardoline reviewed the AmGUARD estimate and never communicated to Cartagena that Ardoline had agreed to greater coverage than Cartagena's estimate or that J.S. Held's draft scope and estimate was incomplete which would result in an underpayment to Greystone.  (Greatsinger Aff., Ex. E, Def.'s Resps. to Pl.'s First Set of Reqs. for Prod., p. 4, Request No. 1, p. BATES 389; Greatsinger Aff., Ex. I, Cartagena Dep., pp. 18:23-20:21.)

**RESPONSE:**  Disputed, in part.  AmGUARD states that the document cited does not support the factual proposition set forth in Paragraph 52 and, further, AmGUARD states that the

document attached to the Greatsinger Affidavit as BATES 389 is not authenticated and is
therefore inadmissible.

AmGUARD also disputes the factual proposition that JS Held's Initial Estimate was
incomplete for the reasons explained above in AmGUARD's Response to Paragraph 50. As a
result, Ardoline would not have communicated that the JS Held Initial Estimate was incomplete.
AmGUARD does not dispute that Ardoline did not communicate to Cartagena that he agreed to
greater coverage than was reflected in Cartagena's estimate.

53.     Instead, Ardoline presented Cartagena's incomplete and inaccurate estimate to
Miller with a Proof of Loss describing the "Whole Loss and Damage" for this claim as
$577,447.15 on November 12, 2018. (Id., pp. BATES 240, 388.)

**RESPONSE:** Disputed, in part. Paragraph 53 of the PPFF contains improper argument
as opposed to a single factual proposition and should be stricken. AmGUARD states that the
documents attached to the Greatsinger Affidavit bearing BATES 240 and BATES 389 are not
authenticated and are therefore inadmissible.

Notwithstanding, AmGUARD incorporates by reference the November 12, 2018 email
and proof of loss attached to AmGUARD's SOF at ¶ 40, Exhibit 25, which is incorporated
herein by reference. AmGUARD does not dispute that Ardoline sent a proof of loss to Miller
indicating an RCV amount totaling $577,477.15, $685.40 in Extra Expense and an ACV amount
totaling $469,212.71 on November 12, 2018. (*Id*.)

54.     Cartagena's email explaining the basis for the AmGUARD estimate (and
demonstrating the ways in which it was incomplete and inaccurate) was never shared with
Greystone or Miller. (Id., pp. BATES 3383-408.)

**RESPONSE:** Disputed, in part. Paragraph 54 of the PPFF contains improper argument

-22-

as opposed to a single factual proposition and should be stricken.  Moreover, AmGUARD states that the document cited in support of this factual proposition (21 pages of claim notes) does not support the proposition for which it is asserted.  Further, AmGUARD does not dispute that it did not send a copy of Cartagena's November 4, 2018 email to Greystone or Miller.

55.     On November 20, 2018, Miller advised Ardoline that Greystone would "be submitting a Proof of Loss once the estimate / cost of repairs is agreed upon.  At this time, we do not agree with your replacement cost estimate of $576,761.75 and as a result, I will be submitting a supplemental estimate once it is ready" to which Ardoline replied, "I cannot issue payment until the proof of loss is returned." (Id., p. BATES 417.)

**RESPONSE:**  Disputed, in part.  AmGUARD states that the document attached to the Greatsinger Affidavit as BATES 417 is not authenticated and is therefore inadmissible.

56.     On December 4, 2018, Miller emailed Ardoline a custom Proof of Loss form indicating the undisputed ACV of the claim was $469,121.71 with additional amounts "To Be Determined." (Id., pp. BATES 591-92.)

**RESPONSE:**  Disputed, in part.  AmGUARD states that the document attached to the Greatsinger Affidavit bearing BATES 591-92 is not authenticated and is therefore inadmissible. Notwithstanding, AmGUARD incorporates by reference the December 4, 2018 email attached to AmGUARD's SOF at ¶ 41, Exhibit 26, as if set forth in full.

57.     On December 20, 2018, AmGUARD issued payments totaling $469,121.71 to Miller and Greystone.  (Greatsinger Aff., Ex. D, Def.'s Resps. to First Set of Reqs. for Admissions, p. 3, Request No. 8.)

**RESPONSE:** Not disputed.

58.     On January 7, 2019, Schmelling provided his third report to Ardoline in which he estimated the value of the claim at $749,000.00, and noted in his "Plan of Action" to "Work with J.S. Held and the public adjuster to secure an agreed on scope and price to repair the fire and water damaged building to an original building valuation." (Greatsinger Aff., Ex. E, Def.'s Resps. to Pl.'s First Set of Reqs. for Prod., p. 4, Request No. 1, pp. BATES 3896-901.)

**RESPONSE:** Disputed. AmGUARD states that the document attached to the Greatsinger Affidavit bearing BATES 3896-901 is not authenticated and is therefore inadmissible. Further, Schmelling testified that the reserve amounts in his reports were "placeholders" and that he believed the loss would be *less* than $750,000. (*See* Greatsinger Aff., Ex. F, Schmelling Dep., 86:21-87:16; 99:17-22.)

59.     On or before January 18, 2019, Miller provided to Schmelling a mitigation invoice from CAT 5, the original restoration contractor Greystone had hired to assist on that aspect of the project. The restoration invoice totaled $392,432.65. (Id., pp. BATES 9-13, 25.)

**RESPONSE:** Disputed, in part. Greystone states that the documents attached to the Greatsinger Affidavit bearing BATES 9-13 do not support the proposition for which they are cited. AmGUARD further states that they are not authenticated and are therefore inadmissible. Greystone admits that the CAT 5 mitigation invoice initially totaled $392,432.65, which was later increased to $421,437.66. (*See* AmGUARD SOF at ¶ 77, Exhibits 8 and 54, which are incorporated as if set forth herein).

60.     Schmelling provided the invoice to Ardoline and recommended AmGUARD hire an outside vendor to review of the CAT 5 mitigation invoice. AmGUARD retained Young & Associates for that purpose. (Id.)

**RESPONSE:**  Not disputed.

61.     On February 12, 2019, Miller provided AmGUARD a line item scope of work and estimate for the reconstruction in the amount of $1,518,847.97 RCV, along with invoices and proposals from the contractors and subcontractors providing the labor and materials.  (Id., p. BATES 743.)

**RESPONSE:**  Disputed, in part.  AmGUARD states that the email attached to the Greatsinger Affidavit bearing BATES 743 does not support the proposition for which it is cited, is not authenticated and is therefore inadmissible.  Moreover, AmGUARD states Miller submitted an estimate to AmGUARD for building repairs in the RCV amount of $1,245,167.05 and ACV amount of $1,138,476.75 on February 12, 2019.  (*See* AmGUARD SOF at ¶ 47, Exhibit 31.)

62.     On February 18, 2019, Schmelling advised Miller "we are not currently in agreement with your line item scope and price" and proposed several reductions to the figures presented in the Miller's initial estimate, including confirming that AmGUARD's prior payment was being credited toward the claim and clarifying the cost of some mold remediation work. (Greatsinger Aff., Ex. J, Engle Martin Subpoena Production, p. BATES 3495.)

**RESPONSE:**  Disputed.  AmGUARD states that the document attached to the Greatsinger Affidavit bearing BATES 3495 does not support the proposition for which it is cited, is not authenticated and is therefore inadmissible.

63.     That same day, Miller provided Schmelling a revised line item scope and estimate in the amount of $1,257,496.53 RCV (the "Miller estimate").  (Id., pp. BATES 3496, 3499, 3725; Doc. 1, Ex. A, Compl., pp. 158-380.)

**RESPONSE:**  Disputed, in part.  AmGUARD states that the documents attached to the

Greatsinger Affidavit bearing BATES 3496, 3499 and 3725 are not authenticated and are

therefore inadmissible.  AmGUARD does not dispute that Miller submitted an estimate to

AmGUARD for building repairs in the RCV amount of $1,245,167.05 and ACV amount of

$1,138,476.75 on February 12, 2019, which document is attached as Exhibit A to the Complaint,

CM/ECF Doc. No. 1.  (*See also* AmGUARD SOF at ¶ 47, Exhibit 31.)

64.     In turn, Schmelling provided his fourth report, along with a copy of the Miller

estimate, to Ardoline in which he estimated the loss at $1,000,000.00.  (Greatsinger Aff., Ex. E,

Def.'s Resps. to Pl.'s First Set of Reqs. for Prod., p. 4, Request No. 1, pp. BATES 2639-644.)

**RESPONSE:**  Disputed.  Greystone states that the document attached to the Greatsinger

Affidavit bearing BATES 2639-644 is not authenticated and is therefore inadmissible.  Further,

Schmelling testified that the reserve amounts in his reports were "placeholders" and that he

believed the loss would be *less* than $750,000  (*See* Greatsinger Aff., Ex. F, Schmelling Dep.,

86:21-87:16; 99:17-22.)  Schmelling further testified that he did not believe the RCV amount for

the rebuild project would exceed $576,000.  (*Id*. at 140:22-142:12.)

65.     On February 20, 2019, Ardoline instructed Schmelling to "have JS Held review

[the Miller estimate] and provide a response of their review and any recommended payments."

(<u>Id.</u>, p. BATES 742.)

**RESPONSE:**  Disputed, in part.  AmGUARD states that the document attached to the

Greatsinger Affidavit bearing BATES 742 is not authenticated and is therefore inadmissible.

Notwithstanding, AmGUARD incorporates by reference the February 20, 2019 email attached to

AmGUARD's SOF at ¶ 49, Exhibit 33, as if full set forth herein.

66.     Later that day, Schmelling provided both the AmGUARD and Miller estimates to

J.S. Held.  In reference to Cartagena's estimate, he stated, "GUARD adjuster [Cartagena]

developed from the JS Held ESX/line item scope and estimate.  <= This is what I would like to discuss with you on the phone." (Greatsinger Aff., Ex. J, Engle Martin Subpoena Production, p. BATES 3496.)

**RESPONSE:** Disputed, in part.  AmGUARD states that the document attached to the Greatsinger Affidavit is not authenticated and is therefore inadmissible.

67.    On March 11, 2019, J.S. Held, Miller and the reconstruction contractor, Sid Grinker, completed a joint inspection of Building 703 for the purpose of reaching an agreed upon scope and cost to repair the building.  (Greatsinger Aff., Ex. E, Def.'s Resps. to Pl.'s First Set of Reqs. for Prod., p. 4, Request No. 1, pp. BATES 3391.)

**RESPONSE:** Disputed.  AmGUARD states that the document attached to the Greatsinger Affidavit bearing BATES 3391 is not authenticated and is therefore inadmissible. Furthermore, AmGUARD states that JS Held was again retained to review the Miller Estimate and provide an opinion on potential additional amounts owed for repair costs, which would include a "side by side analysis" of the AmGUARD Estimate and the Miller Estimate in order "verify that proper items that should be credited are captured" and "to determine if adjustments need to be made."  (*See* AmGUARD SOF at ¶¶ 49-51.)

68.    Two days later, on March 13, 2019, J.S. Held emailed Schmelling and Ardoline its initial impressions of the Miller estimate, stating:

Mr. Ardoline,

In response to the Miller Adjusting Supplement for the above referenced property, JS Held has performed an initial review of the supplied documents and met with Miller Adjusting and Sid Grinker Restoration on-site this Monday (3/11/19). There was some items on-site that were determined to be added or subtracted from the supplement. Most of the items included in the supplement consisted of cleaning/encapsulation of items in which was not included in the REPAIR estimate provided to Miller Adjusting by Berkshire Hathaway. JS Held typically would see these items included in the EMS/DEMO portion of the scope, but believes during the transition from CAT5 being on the project and then Miller Adjusting transitioning in Sid Grinker Restoration, it was determined that Sid Grinker would perform this work.

JS Held has requested the following items from Miller Adjusting/Sid Grinker in order to continue the review of the supplemental items:

1. Roof/Truss Plans to verify the quantities that Miller is requesting.
2. Plumbing Proposal to verify costs and items inclusive of bid.
3. Acquire-Cleaning and Mitigation Invoice for unit#6 (line #3258 in the amount of $9,700.77)

Moving forward, JS Held plans to review the supplement suppled from Miller Adjusting side by side from the original estimate in which Miller Adjusting has included as a lump sum in their supplemental estimate. JS Held will then verify that proper items that should be credited are captured. Items discussed on-site will be recommended to be changed. JS Held will review the above requested items to determine if adjustments need to be made.

Please feel free to contact me directly on my mobile at anytime to discuss.

Thank You,

Chris Smith | Director
J.S. Held LLC

(Greatsinger Aff., Ex. J, Engle Martin Subpoena Production, p. BATES 4145.)

**RESPONSE:** Disputed, in part. The email attached to the Greatsinger Affidavit as

BATES 4145 is not authenticated and is therefore inadmissible. Notwithstanding, AmGUARD

incorporates by reference the March 13, 2019 email attached to the AmGUARD SOF at ¶ 51-52,

Exhibit 34, as if fully set forth herein.

69. On March 14, 2019, Young & Associates advised Schmelling and Ardoline that it

had completed its review of the CAT 5 mitigation invoice and was waiting on proposed revisions

which decreased the amount due to $346,582.99. (Greatsinger Aff., Ex. E, Def.'s Resps. to Pl.'s

First Set of Reqs. for Prod., p. 4, Request No. 1, pp. BATES 1349-350.)

**RESPONSE:** Disputed. The emails attached to the Greatsinger Affidavit at BATES

1349-50 do not support the proposition for which they are cited, are not authenticated and are

therefore inadmissible.

It was not until March 17, 2019 that Young and Associates ("Y&A") advised Engle Martin that it had completed reviewing the CAT 5 mitigation invoice and that, in their opinion, a fair market value of the remediation and mitigation services provided by CAT 5 was $352,500 (the "Y&A Report"). (*See* AmGUARD SOF at ¶¶ 79-80.)  Engle Martin, in turn, further reviewed the Y&A Report, and concluded that the amount suggested was still excessive and warranted further review, which is submitted in a report to AmGUARD on April 29, 2019. (*Id.* at ¶¶ 81-82.)

70.     A few days later, on March 17, 2019, Young & Associates provided a Final Cost Analysis to Schmelling concluding that the amount of $352,500.00 has been agreed upon by CAT 5 and "represent[s] the fair market value of the completed work and related costs for the drying and demolition that was completed." (Id., pp. BATES 1455-465.)

**RESPONSE:**  Not disputed. (*See* AmGUARD SOF at ¶ 79, Exhibit 56.)

71.     On April 29, 2019, Schmelling provided his fifth report to Ardoline in which he estimated the value of the claim at $1,118,000.00 based on J.S. Held's initial scope and estimate and Young & Associates' Final Cost Analysis of the mitigation costs. (Id., pp. BATES 5355-360.)

**RESPONSE:**  Disputed, in part.  Schmelling testified that the reserve amounts in his reports were "placeholders" and that he believed the loss would be *less* than $750,000 (*See* Greatsinger Aff., Ex. F, Schmelling Dep., 86:21-87:16; 99:17-22.)  Schmelling further testified that he did not believe the RCV amount for the rebuild project would exceed the RCV amount of

-29-

$576,761.75 as estimated by AmGUARD. (*Id*. at 140:22-142:12.)

72.    Shortly after this report, Schmelling spoke with Young & Associates to ask questions about the mitigation costs and figures presented in Young & Associates' Final Cost Analysis. The details of this conversation were relayed to Ardoline in an email, dated May 5, 2019, in which Schmelling concluded, "Bottom line after our conversation with [Young & Associates], he feels he had CAT5 compromise as much as he could." (Id., p. BATES 5383.)

**RESPONSE:** Disputed. AmGUARD states that there is no document bearing BATES 5385 attached to the Greatsinger Affidavit. Further, AmGUARD states that even if the document were attached to the Greatsinger Affidavit, it does not appear that such documents were authenticated and are therefore inadmissible. Moreover, the description of the document appears to summarize a discussion between Schmelling and Y&A, which is double hearsay.

73.    On May 10, 2019, J.S. Held advised Ardoline it had met with Miller on site and reviewed the Miller estimate and invoices line-by-line and "agreed to the scope":

Bill:

I was finally able to discuss the loss , and outstanding issues with the PA, David Miller. The general contractor provided a detailed proposal, in the amount of $1,245,167, to complete all the repairs. Chris & the GC went through the estimate, line by line, and agreed to the scope. The only issue was with the roof trusses, and associated framing which Chris asked for support for these scope items. An engineering report, vendor & contractor detailed support documents were provided. That said, there should be no other questions regarding the scope or cost to complete the repairs. Chris, please add anything that I may be missing.

Thomas Costantini | Vice President
J.S.Held LLC

(Id., pp. BATES 1402, emphasis added.)

**RESPONSE:** Disputed, in part. The email attached to the Greatsinger Affidavit is not authenticated and is therefore inadmissible. Notwithstanding, AmGUARD incorporates by reference the May 10, 2019 email from JS Held to Ardoline attached to the AmGUARD SOF at

¶ 66, Exhibit 45 at AMG-CF-GREYSTONE001402, as if set forth in full.

74.     Later that day, Ardoline emailed Miller a proof of loss to be completed for an interim $50,000 advance payment "while we await further information."  (Id., p. BATES 1409.) There was no explanation for the basis of this advance payment or how it would be applied.  (Id.)

**RESPONSE:**  Disputed, in part.  AmGUARD states that the document attached to the Greatsinger Affidavit bearing BATES 1409 is not authenticated is therefore inadmissible.

Notwithstanding, AmGUARD incorporates by reference the May 10, 2019 email and proof of loss attached to the AmGUARD SOF at ¶ 100, Exhibit 70, as if fully set forth herein. AmGUARD further states that Greystone was aware the $50,000 advance was offered as a "stop gap" payment when warned that the rebuild project might stop without further payment as admitted by its 30(b)(6) representative.  (*See* AmGUARD SOF at ¶ 100; *see also* Greatsinger Affidavit at Exhibit A, Sobell Dep., at 126:10-15.)

75.     On May 13, 2019, J.S. Held provided AmGUARD its review of the Miller estimate and said the repair of the building would cost $1,213,303.03.  (Id., pp. BATES 3690-694.)

**RESPONSE:**  Disputed, in part.  The email and attachments attached to the Greatsinger Affidavit are not authenticated and are therefore inadmissible.  Notwithstanding, AmGUARD incorporates by reference the May 13, 2019 email and JS Held Supplemental Report attached to the AmGUARD SOF at ¶¶ 72, 83, Exhibits 48 and 49, as if fully set forth herein.

76.     Ardoline testified J.S. Held's report was "a very important piece of documentation in order to move this file to resolution." (Greatsinger Aff., Ex. G, Ardoline Dep., p. 31:12-20.)

**RESPONSE:**  Disputed.  The quoted deposition testimony does not support the factual

proposition for which it is being asserted.  The testimony by Ardoline was that he was anticipating a side-by-side or "line by line" analysis of the AmGUARD Estimate and the Miller Estimate from JS Held, which he never received, and that it was needed because it was "a very important piece of documentation in order to move this file to resolution."  (*See* Greatsinger Affidavit, Ex. G., Ardoline Dep., at 31:12-20; *see also* AmGUARD SOF at ¶¶ 51, 86.)

77.     Ardoline also testified that it took longer than it should have for AmGUARD and its experts to review and comment on Miller's estimate.  (Id. at 275:20-276:9.)

**RESPONSE:**  Disputed.  The deposition testimony cited does not support the factual proposition for which it is being asserted.  Ardoline testified, over an objection to a leading and compound question, that JS Held took an atypical amount of time to review and prepare the JS Held Supplemental Estimate.  Indeed, the testimony and other record evidence reflects that JS Held did take an atypical amount of time to prepare the JS Held Supplemental Report; that the report was started after months of delay; and that it was not started until the afternoon of Friday, May 10, 2019.  (*See* AmGUARD SOF at ¶ 49-52, 56-74, Exhibits 11, 42 and 50.)

78.     This "very important piece of documentation" (J.S. Held's review of Miller estimate) and was never noted in the claims notes and never provided to Miller or Greystone.  (Greatsinger Aff., Ex. E, Def.'s Resps. to Pl.'s First Set of Reqs. for Prod., p. 4, Request No. 1, pp. BATES 7177-202.)

**RESPONSE:**  Disputed.  The testimony referring to a "very important piece of documentation" refers to a side-by-side or "line-by-line" estimate that Ardoline testified he never received.  (*See* Greatsinger Affidavit. Ex. G. at 31:12-20.)  AmGUARD does not dispute that it did not note receipt of a report that it never received in the claim notes and that it did not forward

the non-existent report to Miller or Greystone.

79.     On May 14, 2019, Ardoline advised Miller "we have just *recently* received the building consultant and mitigation review reports" which both he and Cartagena would review later that week.  However, neither of those reports or the amounts stated in those reports were shared with Miller or Greystone.  Moreover, AmGUARD had received Young & Associates' Final Cost Analysis two months prior to Ardoline's May 14, 2019 email.  (Id., p. BATES 1683, emphasis added.)

**RESPONSE:**  Disputed, in part.  Paragraph 79 contains multiple sentences as opposed to a single factual proposition and should be stricken.  AmGUARD further states that the document attached to the Greatsinger Affidavit bearing BATES 1683 is not authenticated and is inadmissible.  In addition, AmGUARD did not receive the Y&A report until it was sent to AmGUARD on April 29, 2019, when Engle Martin sent it together with its own analysis, which was fifteen (15) days before May 14, 2019.  (*See* AmGUARD SOF at ¶¶ 81-82, Exhibit 58.) AmGUARD received the JS Held Supplemental Estimate on May 13, 2019, one day before May 14, 2019.  (Id. at ¶ 72.)  AmGUARD does not dispute that neither of these reports were shared with Miller or Greystone at that time.

80.     Contrary to Ardoline's representations to Miller above, Cartagena testified he was never asked to review the Miller estimate and "couldn't" review J.S. Held's report because "it was incomplete and didn't have the line-by-line estimate similar to what they had submitted originally." (Greatsinger Aff., Ex. I, Cartagena Dep., p. 33:1-16.)

**RESPONSE:**  Disputed.  Paragraph 80 contains improper argument as opposed to a single factual proposition and should be stricken.  Moreover, it is unclear what "representations to Miller above" refers to, rendering this factual proposition wholly vague and unclear.  The

undisputed testimony that Cartagena provided was that he was unable to use the JS Held
Supplemental Estimate because it was not a "line-by-line" estimate showing the differences
between the AmGUARD Estimate and the Miller Estimate, which was what JS Held was
retained to do, but ultimately did not produce.  (*Id*.; *see also* AmGUARD SOF at ¶ 86.)

81.     Cartagena further testified that his expectation was that Ardoline would contact
J.S. Held to explain AmGUARD needed a line-by-line itemization version of its report so that he
could review it.  (Id., p. 33:17-25.)

**RESPONSE:**  Not disputed.

82.     Neither Ardoline, Cartagena, nor anyone else at AmGUARD ever contacted J.S.
Held to advise that its report was "vague, incomplete, and not up to AmGUARD's standards" or
otherwise "insufficient" and that a line-by-line version was necessary in order for AmGUARD to
adjust the claim.  (Greatsinger Aff., Ex. K, Smith Dep., pp. 10:5-11:19.)

**RESPONSE:**  Disputed.  AmGUARD states that the testimony cited does not support the
factual proposition for which it is cited.  Smith was asked repeatedly asked to "agree or disagree"
with unspecified portions of Ardoline's testimony, over objections on the grounds of form and
lack of foundation, which objections should be sustained and the testimony stricken or
disregarded.  For example, Smith was asked whether "agreed or disagreed" with Ardoline's
testimony that the JS Held Supplemental Estimate was "not sufficient," to which Smith testified,
"I can't comment because I don't know what his expectation was."  (*See* Greatsinger Aff., Ex. K,
Smith Dep., pp. 10:24-11:5.)

In addition, AmGUARD does not dispute that it did not contact JS Held to inform it that
the JS Held Supplemental Estimate was insufficient and was not the side-by-side comparison
that was promised because, before it could do so, Greystone, invoked the appraisal process and

the parties were then waiting on the appraisal award.  (*See* Greatsinger Aff., Ex. G, Ardoline Dep., at 230:19-231:16.)  AmGUARD's dissatisfaction was discussed with Engle Martin, however, who questioned whether the invoice submitted for the JS Held Supplemental Report should be paid at all.  (*See* AmGUARD SOF at ¶ 87.)

83.    Indeed, J.S. Held stands behind its work product to date:

| | 121 | | | 122 |
|---|---|---|---|---|
| 1 | crossed out and it says "no," in your opinion, | 1 | | THE WITNESS:  It's reasonable that I |
| 2 | it either wasn't done or wasn't necessary, and | 2 | | would owe it to my client to answer their |
| 3 | that was reflected in your analysis that you | 3 | | questions. |
| 4 | provided to Mr. Ardoline on May 13th, 2019, | 4 | | BY MR. GRAFF: |
| 5 | right? | 5 | Q | So, for instance, if the criticisms that |
| 6 | MR. REPO:  Object to form; lacks | 6 | | Mr. Ardoline has lodged against you on this |
| 7 | foundation. | 7 | | about it being an incomplete report, it being a |
| 8 | THE WITNESS:  In general, this is a | 8 | | rush job, not a lot of thought and effort being |
| 9 | document that would have been utilized to | 9 | | put into it, if he would have raised that with |
| 10 | produce -- assist in producing that document, | 10 | | you and asked you to explain yourself, you |
| 11 | yes. | 11 | | would have done that? |
| 12 | BY MR. GRAFF: | 12 | | MR. REPO:  Object to form. |
| 13 | Q | Did Mr. Ardoline or Mr. Schmelling ever request | 13 | | THE WITNESS:  Yes. |
| 14 | this supplement with your notes on it? | 14 | | BY MR. GRAFF: |
| 15 | A | Not to my recollection. | 15 | Q | And you don't feel that any of those criticisms |
| 16 | Q | It would -- if they would have requested it, | 16 | | that I just gave you are an accurate |
| 17 | you would have happily provided it, fair? | 17 | | representation of the work that you did on this |
| 18 | A | I would have no issue providing my field notes | 18 | | file, fair? |
| 19 | to my client, no. | 19 | | MR. REPO:  Object to form. |
| 20 | Q | And you'd have no issue with answering any | 20 | | THE WITNESS:  I can't speak to how |
| 21 | questions the client might have about the work | 21 | | the client received their work product, but I |
| 22 | product, about your analysis, the detail; you'd | 22 | | feel like the work product that we put out was |
| 23 | have no problem answering any of those | 23 | | what we anticipated they needed. |
| 24 | questions, fair? | 24 | | BY MR. GRAFF: |
| 25 | MR. REPO:  Object to form. | 25 | Q | You're standing behind your work product? |

| 123 | | 124 | |
|---|---|---|---|
| 1 | MR. REPO: Objection; lacks | 1 | THE WITNESS: I would obey my oath |
| 2 | foundation. | 2 | that I would be required to state my current |
| 3 | THE WITNESS: Yes. | 3 | stance on the work product. |
| 4 | MR. REPO: Object to form. | 4 | BY MR. GRAFF: |
| 5 | BY MR. GRAFF: | 5 | Q  Which is you still stand behind it, fair? |
| 6 | Q  If you get called to testify at trial, you're | 6 | MR. REPO: Same objection. |
| 7 | not going to tell a jury anything other than | 7 | THE WITNESS: As of today, yes, I |
| 8 | "The side-by-side analysis that I did and that | 8 | stand behind it. |
| 9 | I gave to AmGUARD in May of 2019 is an accurate | 9 | BY MR. GRAFF: |
| 10 | reflection of the scope and cost to put these | 10 | Q  And your analysis, your side-by-side analysis, |
| 11 | buildings in their pre-loss condition," fair? | 11 | is an accurate estimate of the scope and cost |
| 12 | MR. REPO: Object to form; lacks | 12 | to put these buildings in their pre-loss |
| 13 | foundation and calls for improper hypothetical | 13 | condition? |
| 14 | testimony in the future. | 14 | MR. REPO: Object to form; lacks |
| 15 | THE WITNESS: My response to that | 15 | foundation. |
| 16 | would be that the work product that J.S. Held | 16 | THE WITNESS: I would say that the |
| 17 | reviewed and made recommendations on, we're | 17 | initial scope is what we knew at the time, and |
| 18 | comfortable with stating that it's accurate to | 18 | then the review of the supplement was, again, |
| 19 | the best of our knowledge. | 19 | what we reviewed and felt reasonable at the |
| 20 | BY MR. GRAFF: | 20 | time of the production of that report. |
| 21 | Q  So, for instance, you're not going to show up | 21 | BY MR. GRAFF: |
| 22 | at a later date and testify that "Well, the | 22 | Q  And at the time of the production of that |
| 23 | analysis really wasn't what the client wanted," | 23 | second report in May of 2019, you had all of |
| 24 | fair? | 24 | the information you felt you needed to do that |
| 25 | MR. REPO: Same objection. | 25 | analysis? |

(Id., pp. 121-24, emphasis added.)

**RESPONSE:** Disputed.  Paragraph 83 contains improper argument as opposed to a factual proposition and should be stricken.  The cited "evidence" for the proposition that "JS Held stands behind its work product to date" refers to selected highlighted testimony that was the subject of numerous objections to form, foundation and improper hypotheticals.  The objections should be sustained and the testimony stricken or disregarded.

84.     On May 15, 2019, CAT 5 followed up with Schmelling and Ardoline about the status of payment on the overdue mitigation invoice which CAT 5 and Young & Associates had reached an agreement on in March.  The next day, Ardoline responded, "We are reviewing the services you have provided along with the claim and will advise about payment when able." (Greatsinger Aff., Ex. E, Def.'s Resps. to Pl.'s First Set of Reqs. for Prod., p. 4, Request No. 1, pp. BATES 1687-688.)

**RESPONSE:** Disputed, in part. AmGUARD states that the document attached to the Greatsinger Affidavit bearing BATES 1687-688 is not authenticated and is therefore inadmissible.

85. Despite information from both Miller and J.S. Held that the reconstruction costs would exceed $1.2M, and rather than follow up with J.S. Held for clarification on its opinion or work product in that regard, on May 17, 2019, Cartagena ghost-wrote an email to Miller indicating that AmGUARD's evaluation of the claim was complete, the ACV portion of the claim had concluded, and that AmGUARD's original valuation of the claim (for which payment had been made in November 2018), remains unchanged:

| From: | Robert Cartagena [/O=GUARD INSURANCE GROUP/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=ROBERT CARTAGENA78B] |
|---|---|
| Sent: | 5/17/2019 3:07:38 PM |
| To: | William Ardoline [/O=GUARD INSURANCE GROUP/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=William Ardoline7a9] |
| Subject: | Greystone |

Mike:

As you are aware, we have been attempting to resolve this matter for the past few months. Unfortunately, we have been receiving incomplete information that would allow for a fair and accurate evaluation of the damages.

In order to clarify; you have presented a claim for damages in the amount of $1,247,667.05.

We have reviewed this matter in its entirety and have completed our evaluation as follows:

Remediation and demolition:  $274,263.34
Our rebuild evaluation is unchanged.
Replacement Cost Value $576,761.75
Less Depreciation (105,825.44)
Actual Cash Value $470,936.31
Less Deductible (2,500.00)
Net Claim $468,436.31

At this time we are prepared to conclude the ACV portion of the claim for $742,699.65 ($468,436.31 paid)

The holdback of $105,825.44 remains open pending supports for funds expended and proof of repairs a completed.

**BOB CARTAGENA**
**FIELD PROPERTY ADJUSTER**

The email did not specify what "incomplete information" AmGUARD had received on the claim or suggest any fault by the insured. (Greatsinger Aff., Ex. E, Def.'s Resps. to Pl.'s

First Set of Reqs. for Prod., p. 4, Request No. 1, p. BATES 3700, emphasis added.)

**RESPONSE:** Disputed, in part.  Paragraph 85 contains improper argument, multiple factual propositions (as opposed to a single factual proposition) and should be stricken.  Further, AmGUARD notes that there is no factual support for the first full sentence of Paragraph 85.  In addition, AmGUARD states that the document attached to the Greatsinger Affidavit bearing BATES 3700 is not authenticated and is therefore inadmissible.

Notwithstanding, AmGUARD incorporates by reference the May 17, 2019 email attached to AmGUARD's SOF at ¶ 89, Exhibit 61, as if set forth herein.  AmGUARD does not dispute that it did not specify the "incomplete information" referenced in the email was the JS Held Supplemental Estimate it had recently received and does not dispute that it was not suggesting this was due to any fault on the part of Greystone.  (*See* AmGUARD SOF at ¶ 86.)

86.     Cartagena's email, dated May 17, 2020, did not consider any of the information AmGUARD had received from Miller, J.S. Held, Schmelling, the reconstruction contractor, or any other source concluding that the reconstruction portion of the claim exceeded AmGUARD's original estimate and payment, except to say "we have been receiving incomplete information".  (Id.)

**RESPONSE:** Disputed.  AmGUARD notes that there is no evidence cited to support this factual proposition.  Moreover, the information contained in the May 17, 2019 email, including the RCV amount, ACV amount, depreciation, deductible amounts, were based on the AmGUARD Estimate that AmGUARD provided to Greystone on November 4, 2018.  (*See* AmGUARD SOF at ¶ 35, Exhibit 23.)  The AmGUARD Estimate was based on the JS Held Initial Estimate which, as previously explained, did not change the scope of that estimate, but instead made reductions for property and fixture depreciation, as well as reductions of certain

other allowances. (*Id*. at ¶¶ 35-38.)  Further, the amount set forth in the May 17, 2019 email

included what AmGUARD calculated based on its review of the Y&A report, Engle Martin's

April 29, 2019 report and AmGUARD's own internal review and analysis of a native file Excel

spreadsheet provided to AmGUARD.  (*See* Greatsinger Affidavit, Ex. I, Cartagena Dep., at 78:5-

79:18; *see also* AmGUARD SOF at ¶¶ 82, 85, 88.)

87.     Cartagena's email, dated May 17, 2020, also reduced the CAT 5 mitigation

invoice and Young & Associates Final Cost Analysis by about $75,000 to $274,263.34.  (Id.)

**RESPONSE:** Not disputed.

88.     Despite testifying Miller's estimate and J.S. Held's analysis were documents that

were needed to evaluate the claim and "a very important piece of documentation in order to

move this file to resolution", (Greatsinger Aff., Ex. G, Ardoline Dep. at 31:12-20, 100:15-23),

Ardoline copied Cartagena's email verbatim (typos and all) and sent it to Miller.  (Greatsinger

Aff., Ex. E, Def.'s Resps. to Pl.'s First Set of Reqs. for Prod., p. 4, Request No. 1, pp. BATES

1689-690.)

**RESPONSE:** Disputed.  The Ardoline deposition testimony quoted above does not

support the factual proposition for which it is asserted.  The testimony by Ardoline was that he

was anticipating a side-by-side or "line by line" analysis of the AmGUARD Estimate and the

Miller Estimate from JS Held, which he never received, and was still needed because it was "a

very important piece of documentation in order to move this file to resolution." (*See* Greatsinger

Affidavit, Ex. G., Ardoline Dep., at 31:12-20; *see also* AmGUARD SOF at ¶¶ 51, 86.)

AmGUARD further states that there is no support for the additional factual propositions in

Paragraph 88.

89.     There is no documentation or estimate in the 7,000+ page claim file that was

generated by AmGUARD or shared with Miller or Greystone to support the reduced mitigation

figure.  Instead, that information was contained only in Ardoline's email to Miller presenting

AmGUARD's final valuations on the ACV portion of the claim.  (Greatsinger Aff., Ex. E, Def.'s

Resps. to Pl.'s First Set of Reqs. for Prod., p. 4, Request No. 1, p. BATES 1689.)

**RESPONSE:** Disputed.  AmGUARD's calculation was based on an internal review of

the Y&A report, Engle Martin's April 29, 2019 report and Cartagena's analysis of a native file

Excel spreadsheet provided by CAT 5 to AmGUARD.  (*See* Greatsinger Affidavit, Ex. I,

Cartagena Dep., at 78:5-79:18, Exhibit 8 to the Cartagena Deposition; *see also* AmGUARD SOF

at ¶¶ 82, 85, 88.)  That native file excel spreadsheet was produced to Greystone in this litigation

and was introduced, in part, as an exhibit at Cartagena's deposition. (*Id.*)

90.     Perhaps forgetting that he authored the email, Cartagena perjured himself by

testifying that if it were his claim he would have included more specific information about the

J.S. Held report:



```
                                                      Page 83
 1  A   I believe they're a little more detailed, but
 2      for the most part, yes.
 3              MR. GRAFF:  Craig, I'd make a request
 4      for the estimating guidelines that are now
 5      written.
 6              MR. JACOBSON:  Sure.
 7  BY MR. GRAFF:
 8  Q   Turn to Bates 1689.
 9  A   Yes, I have it open.
10  Q   This is an e-mail from Mr. Ardoline to the
11      public adjuster here dated May 17th, 2019.  You
12      and others were included on this e-mail?
13  A   Yes.
14  Q   Mr. Ardoline basically says, "We're sticking
15      with the rebuild estimate; that has not
16      changed," fair?
17  A   Allow me a moment to read the e-mail.
18              MR. JACOBSON:  Object to form and
19      foundation.
20              THE WITNESS:  Okay.  The question?
21  BY MR. GRAFF:
22  Q   Mr. Ardoline essentially says, "We're sticking
23      with the original rebuild estimate from many
24      months ago; we're not changing that"?
25              MR. JACOBSON:  Objection to form.
```

Page 84

1          THE WITNESS: Yes.
2    BY MR. GRAFF:
3    Q  Do you see any reference in here to a J.S. Held
4       estimate that was received but did not meet
5       AmGUARD's standards?
6    A  The only thing, based on this e-mail, is where
7       he mentions "Unfortunately, we have been
8       receiving incomplete information that would
9       allow for a fair and accurate representation of
10      damages."
11   Q  Does he specify who is giving that incomplete
12      information?
13   A  Not in this e-mail, no.
14   Q  Okay. If it was your claim and you used J.S.
15      Held and decided to disregard their analysis,
16      would you tell the insured that the J.S. Held
17      analysis existed?
18          MR. JACOBSON: Object to form;
19      foundation.
20          THE WITNESS: Yes.
21   BY MR. GRAFF:
22   Q  Why?
23   A  Because J.S. Held was the one that did the
24      evaluation on the property.
25   Q  Do you think it was Mr. Ardoline's

Page 85

1       responsibility to tell them that -- it was
2       Mr. Ardoline's responsibility to tell the
3       insured that J.S. Held has an estimate for $1.2
4       million, but that AmGUARD disagrees with it?
5          MR. JACOBSON: Objection to form and
6       foundation.
7          THE WITNESS: Based on this e-mail,
8       he could have been more specific.
9    BY MR. GRAFF:
10   Q  Well, you already agreed with me that an
11      insurance company has to be fair and honest
12      with their insured, correct?
13   A  Absolutely.
14   Q  Being fair and honest with this insured would
15      let them know that J.S. Held came up with an
16      estimate or an analysis that AmGUARD is
17      disregarding. Would you agree with that?
18          MR. JACOBSON: Objection to form and
19      foundation.
20          THE WITNESS: I wouldn't say that we
21      were disregarding it. We were disagreeing with
22      it.
23   BY MR. GRAFF:
24   Q  You should at least let the insured know that
25      the J.S. Held analysis exists, right?

(Greatsinger Aff., Ex. I, Cartagena Dep., pp. 83:8-85:8, emphasis added.)

**RESPONSE:**  Disputed.  Paragraph 90 contains improper argument, baseless speculation and should be stricken in its entirety.  Setting aside there are no factual propositions to respond to in Paragraph 90, there is nothing in the foregoing testimony that even remotely suggests that Cartagena perjured himself.  Rather, the highlighted testimony reflects a series of improper hypothetical questions that were objected to as to form and lack foundation, all of which should be sustained and the testimony stricken or disregarded.

91.      Ardoline sent another Proof of Loss form to Miller indicating the "Whole Loss and Damage" for this claim was $851,025.09, including $576,761.75 for the reconstruction and $274,263.34 for the mitigation, consistent with Cartagena's figures.  (Greatsinger Aff., Ex. E, Def.'s Resps. to Pl.'s First Set of Reqs. for Prod., p. 4, Request No. 1, pp. BATES 1689-690.)

**RESPONSE:**  Disputed, in part.  AmGUARD states that the document attached to the

-41-

Greatsinger Affidavit is not authenticated and is therefore inadmissible.  Notwithstanding,

AmGUARD incorporates by reference the May 17, 2019 email and proof of loss attached to the

AmGUARD SOF at ¶ 89, Exhibit 61, as if set forth herein in full.

92.     Given Miller and Greystone's disagreement over the value of the claim, on June

3, 2019, Greystone rejected AmGUARD's proof of loss and invoked the appraisal clause under

the policy.  (Doc. 1, Def.'s Notice of Removal, p. 381.)

**RESPONSE:** Not disputed.

93.     Cartagena testified six months to review and approve a mitigation invoice "seems

like a long time" and it had never taken him long to do so.  (Greatsinger Aff., Ex. I, Cartagena

Dep. at 40:25-42:17.)

**RESPONSE:** Disputed.  The deposition testimony cited does not support the factual

proposition for which it is asserted.  As the testimony makes clear, Cartagena repeatedly testified

that, over the objections of counsel on the grounds of form, foundation and the use of improper

hypotheticals, he did not "know what all the details are.  Like I said, I wasn't involved in the

day-to-day aspects of the file.  There may have been reasons for the delay.  I don't know what

they are."  (Greatsinger Aff., Ex. I, Cartagena Dep. at 40:25-41:11.)  He further testified,

"Without knowing all the specifics of what was going on in the claim, I don't know if there were

any reasons for the delay.  I - - I don't know."  (*Id*. at 42:6-9.)

94.     Another senior adjuster at AmGUARD, Paul Prislupsky, testified six months to

review and approve a mitigation invoice was unreasonable and something he "would try not to"

do.  (Greatsinger Aff., Ex. L, Prislupsky Dep. at 28:5-22.)

**RESPONSE:** Disputed, in part.  The deposition testimony cited does not support the

factual proposition for which it is asserted.  As the testimony makes clear, Prislupsky was asked,

over the objections of counsel on the grounds of form, foundation and an improper hypothetical about hypothetical lengths of time to review a report.  The objections should be sustained and the testimony stricken or disregarded.

95.     Even Ardoline testified "If we owe it, we would - we would pay it" in reference to the \$274,263.34 mitigation figure reached by Cartagena.  (Greatsinger Aff. Ex. G, Ardoline Dep. at 155:12-156:5.) Still AmGUARD made no additional payments on this claim in the interim.

**RESPONSE:**  Disputed, in part.  On May 17, 2019, after AmGUARD confirmed that it would pay the \$274,263.34 mitigation figure reached by Cartagena, AmGUARD sent a proof of loss to Greystone which was not returned, who instead elected to invoke the appraisal before payment was issued.  (*See* AmGUARD SOF at ¶ 89.)

96.     Around the time appraisal was invoked, Greystone's reconstruction contractor, Sid Grinker, stopped work for several weeks while waiting for AmGUARD to approve additional subcontractor bids.  (Greatsinger Aff., Ex. B, Rankin Dep. at 67:10-68:17)

**RESPONSE:**  Not disputed.

97.     AmGUARD attempted to retain its outside adjusting firm, Engle Martin, as its appraiser.  However, Engle Martin declined the assignment due to Schmelling's heavy involvement in the claim and because "Engle Martin would not be looked up as being impartial in this appraisal".  (Greatsinger Aff., Ex. E, Def.'s Resps. to Pl.'s First Set of Reqs. for Prod., p. 4, Request No. 1, pp. BATES 1730-731.)

**RESPONSE:**  Disputed, in part.  AmGUARD states that the document attached to the Greatsinger Affidavit bearing BATES 1730-731 is not authenticated and is therefore

inadmissible.

98.     AmGUARD instead hired Jeff Weigen at RGA Claims Management ("Weigen")
to act as its appraiser.  (Id., pp. BATES 1747-749.)

**RESPONSE:**  Disputed, in part.  AmGUARD states that the document attached to the
Greatsinger Affidavit bearing BATES 1747-749 is not authenticated and is therefore
inadmissible.

99.     Weigen has worked exclusively as a property claim adjuster for more than 30
years.  (Greatsinger Aff., Ex. H, Weigen Dep., p. 13:13-16.)

**RESPONSE:**  Not disputed.

100.     During that time, Weigen has never disregarded an expert's estimate for
reconstruction or mitigation because "[h]e is providing me, as the expert, with a number that he
can actually do the work for.  So his number would be an accurate number, and I must have faith
in that contractor if I'm hiring him to do that for me."  (Id., p. 16:18-18:12.)

**RESPONSE:**  Disputed.  The deposition testimony cited does not support the factual
proposition for which it is asserted.  The deposition testimony makes clear that Weigen was
asked a hypothetical, which was objected to on the grounds of foundation and completeness, to
which he responded that "[d]ifferent companies do different things."  (*Id*. at 17:10.)  The
objections should be sustained and the testimony stricken or disregarded.

101.     Weigen agreed that once an expert tells an insurer the cost of the reconstruction or
mitigation, that is what the insurance company should pay.  (Id.)

**RESPONSE:**  Disputed.  The deposition testimony cited does not support the factual
proposition for which it is asserted.  There is nothing in Weigen's testimony wherein he testified
that "once an expert tells an insurer the cost of reconstruction or mitigation, that is what the

-44-

insurance should pay."  The objections made during this line of questioning should be sustained and the testimony stricken or disregarded.

102.    Notably, AmGUARD never provided Weigen with the J.S. Held estimate for $711,496.49 or the J.S. Held update for $1,213,303.03.  That information was supplied to Weigen by Greystone's appraiser, Paul Hausz.  (Id., pp. 93:11-95:10.)

**RESPONSE:**  Disputed.  AmGUARD provided a complete copy of all file materials to RGA Claims Management ("RGA"), including the JS Held Estimate and JS Held Supplemental Estimate, on June 6, 2019, three (3) days after Greystone invoked appraisal.  (*See* Affidavit of William Ardoline, dated November 5, 2020, attached hereto as Exhibit A at ¶¶ 1-9, Group Exhibit 1.)

103.    Weigen also agreed that at the time of appraisal both parties in this case knew the cost of the reconstruction was in excess of $1.2M and the cost of mitigation was $352,500.  (Id., p. 68:9-69:15.)

**RESPONSE:**  Disputed.  The deposition testimony cited does not support the factual proposition for which it is asserted.  Weigen testified that he did not see a disagreement between the JS Held Supplemental Report and the Miller Estimate on the $1.2 million amount other than $30,000, and that he agreed with it only because both sides had agreed to that number.  (*Id*.) Furthermore, Weigen testified that the $352,000 amount was an agreed to figure and that if he were the claim handler, he would only agree to pay it with the approval of a supervisor.  (*Id*.)

104.    Indeed, Weigen only briefly reviewed AmGUARD's estimate, specifically the bottom number, which told him, "Well, basically, it told me why waste my time going through the estimate" and "I just felt from the little bit I looked at it, I thought it was missing stuff, and that's only based on looking at the other estimates."  (Id., pp. 71:12-76:9.)

**RESPONSE:** Disputed, in part. AmGUARD does not dispute that the partially quoted language above was taken from Weigen's deposition, however, the citation provided includes an five (5) additional pages of Weigen's deposition testimony, much of which includes improper hypotheticals and other improper questions that were objected to by counsel. As a result, AmGUARD is left to guess which testimony is relevant to the factual proposition cited herein. As a result, AmGUARD submits that the various objections noted therein should be sustained and the testimony stricken or disregarded.

105.    Weigen further testified that were he handling this claim he "most likely" would not have disregarded what the experts were saying was a reasonable price for the mitigation or reconstruction. (Id., pp. 47:15-48:7.)

**RESPONSE:** Disputed. The deposition testimony cited does not support the factual proposition for which it is asserted. Weigen testified that he never inquired as to what advice AmGUARD took from its experts and that it wasn't confusing to him at all what information AmGUARD considered from its experts because "I was just going to do the appraisal. I wasn't really too worried about anything else." (*Id*. at 47:15-48:12.)

106.    On July 30, 2019, AmGUARD's appraiser, Jeff Weigen, advised Ardoline that he had "a few concerns especially regarding mitigation. [...] To date, [CAT 5] has not been paid and informed us that they might no longer agree to the [Young & Associates] figure, as the mitigation was completed months ago. I have a good relationship with CAT 5 and I believe if they could be paid promptly they will still honor their agreement of $352,500.00." (Greatsinger Aff., Ex. E, Def.'s Resps. to Pl.'s First Set of Reqs. for Prod., p. 4, Request No. 1, p. BATES 3716.)

**RESPONSE:** Disputed. AmGUARD states that the document attached to the

Greatsinger Affidavit bearing BATES 3716 is not authenticated and is therefore inadmissible.

107.    Weigen also advised Ardoline, "since this claim is now being monitored by insurance regulators, I would suggest that the undisputed ACV amount for reconstruction be paid promptly. This would show the regulators your good faith in trying to promptly adjust this claim, except for the [public adjuster]'s disputed items." (Id.)

**RESPONSE:**  Disputed.  AmGUARD states that the document attached to the Greatsinger Affidavit bearing BATES 3716 is not authenticated and is therefore inadmissible.

108.    Ardoline's response was, "I'm not sure how to answer[.]"  (Id.)

**RESPONSE:**  Disputed.  AmGUARD states that the document attached to the Greatsinger Affidavit bearing BATES 3716 is not authenticated and is therefore inadmissible.

109.    On August 2, 2019, Ardoline's supervisor, Nona Loftus, emailed Ardoline instructions to "send the POL for the 352,500" for mitigation.  (Id., p. BATES 3764.)

**RESPONSE:**  Disputed.  AmGUARD states that the document attached to the Greatsinger Affidavit bearing BATES 3764 is not authenticated and is therefore inadmissible.

110.    That same day, Ardoline emailed Weigen (not Greystone or Miller) a Proof of Loss form in the amount of $352,500 for "Electrical Reconciliation" but no payment. (Id., pp. BATES 1868, 1873.)

**RESPONSE:**  Disputed.  AmGUARD states that the documents attached to the Greatsinger Affidavit bearing BATES 1869, 1873 are not authenticated and are therefore inadmissible.

111.    On August 13, 2019, an appraisal award was entered as follows:

- $372,446.32 for Mitigation (AmGUARD had paid $0 up to this point);

- $1,242,110.11 for Reconstruction (AmGUARD had paid $469,121.71 up to this point);

- $18,759.25 for Mold Remediation (AmGUARD had paid $0 up to this point); and

- $8,629.48 for Increased Cost of Construction (AmGUARD had paid $0 up to this point).

(Greatsinger Aff., Ex. E, Def.'s Resps. to Pl.'s First Set of Reqs. for Prod., p. 4, Request No. 1, pp. BATES 2017-020.)

**RESPONSE:** Disputed, in part. AmGUARD states that the documents attached to the Greatsinger Affidavit bearing BATES 2017-020 are not authenticated and are therefore inadmissible. Notwithstanding, AmGUARD incorporates by reference the August 13, 2019 Appraisal Award attached to the AmGUARD SOF at ¶ 93, Exhibit 63, as if set forth in full.

112.    Consistent with the appraisal award, AmGUARD issued two additional checks in the amounts of $957,323.60 and $15,000.00 on September 5, 2020. This raised AmGUARD's total payments on this claim to $1,441,445.30. (Greatsinger Aff., Ex. M, Def.'s Resps. to Pl.'s First Set of Interogs., p. 12, Interrog. No. 21.) These were the only payments issued since December 20, 2018. (Id.)

**RESPONSE:** Disputed in part. AmGUARD later also timely paid two other amounts owed for depreciation under the appraisal award and other unexpected expenses after it was entered on August 13, 2010. (*See* AmGUARD SOF at ¶¶ 56, 93-94.)

### AMGUARD'S BREACH OF THE INSURANCE CONTRACT

113.    For the mitigation portion of the claim, AmGUARD failed to issue any payment to its insured until September 5, 2020, despite having received CAT 5's mitigation invoice on January 18, 2019, Young & Associates' Final Cost Analysis on March 17, 2019, Cartagena's reduced mitigation estimate on May 17, 2019, and Weigen's recommendation to pay the $352,500.00 on July 30, 2019. (See PPFF, ¶¶ 59, 70, 85, 106, supra.)

**RESPONSE:** Disputed. AmGUARD timely paid all amounts owed under the appraisal

award after it was entered on August 13, 2010 within thirty (30) days, including payment of the

mitigation invoice in the amount of $372,466.32. (*See* AmGUARD SOF at ¶¶ 93-94.)

Moreover, AmGUARD did not receive the Y&A report on March 17, 2019, but rather on April

29, 2019. (*Id*. at ¶ 82.)

114.    For the reconstruction portion of the claim, AmGUARD failed to issue any

payment to its insured consistent with J.S. Held's estimate dated October 12, 2018, Miller's

estimate dated February 18, 2019, J.S. Held's report dated May 13, 2019, or Weigen's

recommendation to pay the undisputed ACV on July 30, 2019, until September 5, 2020. (See

PPFF ¶¶ 35, 63, 75, 107, supra.)

**RESPONSE:**  Disputed.  Within five days of receipt of JS Held's Initial Estimate on

October 12, 2018, AmGUARD offered a $150,000 advance payment to Greystone. (*See*

AmGUARD SOF at ¶ 28.)  On October 31, 2018, AmGUARD offered a $200,000 advance

payment to Greystone by email to Miller P.A. and Avid Risk. (*Id*. at ¶ 31.)  AmGUARD also

offered another $50,000 advance to Greystone on May 10, 2019. (*Id*. at ¶ 100.)  All of these

advance offers were either rejected or were never provided to Greystone because Miller P.A.

failed to provide inform Greystone they had been received. (*Id*.)  In addition, AmGUARD

issued payment for the undisputed $469,121.71 ACV amount on December 20, 2018. (*Id*. at ¶

42.)

115.    In Ardoline's May 17, 2019 email to Miller–written by Cartagena–concluding the

ACV portion of the claim, AmGUARD stated it had "incomplete information that would allow

for a fair and accurate evaluation of the damages." (Greatsinger Aff., Ex. E, Def.'s Resps. to Pl.'s

First Set of Reqs. for Prod., p. 4, Request No. 1, pp. BATES 1689, 3700.)

**RESPONSE:**  Disputed.  *See* AmGUARD's Response to Paragraph 85 which is

incorporated herein by reference as if set forth in full.

116.    Despite its obligations to select a "competent and impartial appraiser",
AmGUARD attempted to retain the same firm that handled its outside adjusting on this claim for
that role. (Greatsinger Aff., Ex. C, Def.'s Resps. to Pl.'s Second Set of Reqs. for Prod., p. 6,
Request No. 7, pp. BATES 7473; Greatsinger Aff., Ex. E, Def.'s Resps. to Pl.'s First Set of
Reqs. for Prod., p. 4, Request No. 1, pp. BATES 1730-731.)

**RESPONSE:**  Disputed.  The documents attached to the Greatsinger Affidavit bearing
BATES 7473 AND 1730-731 are not authenticated and are therefore inadmissible.

### DAMAGES FROM AMGUARD'S BREACH OF CONTRACT

117.    As a result of AmGUARD's breach of the contract and delays in making
payment, Greystone incurred the cost of a public adjuster.  Greystone's president, Jacob Sobell,
testified Miller was hired because a month after the insurance claim had been made,
"AmGUARD was still reviewing our bylaws to see if there was even coverage, which we felt
was obnoxiously silly" and the decision was made more than a month into the claim.
(Greatsinger Aff., Ex. A, Sobell Dep., pp. 79:3-80:21.)

**RESPONSE:**  Disputed.  Paragraph 117 contains improper argument and multiple factual
propositions (as opposed to a single factual proposition) and should be stricken.  Further,
Greystone's president and 30(b)(6) witness, Jacob Sobell, testified that Miller was retained
because of an insurance dispute Greystone had with a different insurance carrier a year earlier.
(*See* Greatsinger Aff., Exhibit A, Sobel Dep. at 18:12-19:4.)  He further admitted that Miller was
hired less than thirty (30) days after the fire occurred.  (*See* AmGUARD's Response to
Paragraph 31 above, which is incorporated as if set forth herein in full.)

118.    Only after Miller became involved did AmGUARD communicate its coverage
position and intentions with the loss.  (PPFF, ¶¶ 29-31, supra.)

**RESPONSE:**  Disputed.  AmGUARD timely accepted coverage the same day as the fire occurred  (*See* AmGUARD SOF at ¶ 14.)

119.    Greystone paid Miller 10 percent of the total value of the claim, or $164,196.51. (Greatsinger Aff., Ex. A, Sobell Dep., pp. 83:21-85:24.)

**RESPONSE:**  Disputed, in part.  AmGUARD does not dispute that Greystone paid Miller 10 percent of the total value of the claim, or $164,196.51, but notes that Greystone did not pay any of those costs out of pocket due to an overpayment by AmGUARD to Greystone in the amount of $257,056.23.  (*See* AmGUARD SOF at ¶¶ 106-108, 116.)

120.    Greystone also incurred a $4,500 expense to hire an appraiser necessitated by AmGUARD's refusal to pay an amount consistent with its experts and its own valuation of the mitigation portion of this claim.  (Id., pp. 199:21-201:16.)

**RESPONSE:**  Disputed, in part.  AmGUARD does not dispute that Greystone paid $4,500 as part of the appraisal process, but notes that Greystone did not pay any of those costs out of pocket due to an overpayment by AmGUARD to Greystone in the amount of $257,056.23. (*See* AmGUARD SOF at ¶¶ 106-108, 116.)  In addition, the AmGUARD Policy specifies that the parties must bear the respective costs of their chosen appraiser in the event that one of the parties invokes the appraisal clause.  (*Id*. at ¶ 10.)

Dated:  November 6, 2020                              Respectfully submitted,

/s/ Craig A. Jacobson
Ryan T. Brown
Craig A. Jacobson
Geoffrey J. Repo
Gordon Rees Scully Mansukhani LLP
One North Franklin, Suite 800
Chicago, IL 60606
Telephone: (312) 980-6784
Facsimile: (312) 565-6511
craig.jacobson@grsm.com
grepo@grsm.com

Attorneys for AmGUARD Insurance Company

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2020, a copy of the foregoing document was filed electronically.  Notice of this filing will be served on all parties of record by operation of the Court's electronic filing system.

*/s/ Craig A. Jacobson*
Craig A. Jacobson
Gordon Rees Scully Mansukhani LLP
One North Franklin, Suite 800
Chicago, IL 60606
Telephone: (312) 980-6784
Facsimile: (312) 565-6511
craig.jacobson@grsm.com

*Attorneys for AmGUARD Insurance Company*