IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

GREYSTONE CONDOMINIUM AT
BLACKHAWK OWNERS ASSOCIATION, INC.,

OPINION AND ORDER

Plaintiff,

19-cv-768-slc

v.

AMGUARD INSURANCE COMPANY,

Defendant.

In this civil removal action, plaintiff Greystone Condominium at Blackhawk Owners Association, Inc. (Greystone) asserts causes of action for breach of contract and bad faith against its insurer, AmGUARD Insurance Company, for its alleged mishandling of Greystone's claim for fire-related losses to a building in its condominium development in Middleton, Wisconsin. Before the court are competing summary judgment motions from plaintiff (dkt. 35) and from defendant (dkt. 50).

For the reasons stated below, I am denying both motions with respect to Greystone's claim that AmGUARD failed to investigate and pay the rebuild costs in good faith. The evidence allows for competing inferences that require the court to evaluate the live testimony of the witnesses at trial. Moreover, to prove bad faith, Greystone must establish not only that AmGUARD lacked a reasonable basis for denying the claim, but that AmGUARD knew or recklessly disregarded this fact. Questions of subjective intent generally cannot be resolved on summary judgment. *Alexander v. Erie Ins. Exch.*, 982 F.2d 1153, 1160 (7th Cir. 1993) ("[S]ummary judgment ought to be used sparingly and with great caution . . . where subjective intent is a factor in the determination.").

I am granting AmGUARD's motion for summary judgment (and denying Greystone's) with respect to the bad faith claim concerning the mitigation expenses. Greystone has not

adduced sufficient evidence from which a trier of fact could find that AmGUARD's investigation of those expenses was unreasonable.

I am granting summary judgment to AmGUARD on a handful of other freestanding breach-of-contract claims that are patently meritless.

The following facts are undisputed[1]:

## FACTS

At all relevant times, Greystone owned and operated an eight-building condominium complex in Middleton, Wisconsin.  On August 13, 2018, a fire occurred at "Building 1" of the complex. Greystone immediately notified its insurer, AmGUARD, which opened a claim file and assigned it to William Ardoline, a property adjuster who had been with AmGUARD for more than five years.  That same day, Ardoline hired an independent adjusting firm, Engle Martin & Associates ("Engle Martin"), to adjust the loss.

Keith Schmelling, an adjuster from Engle Martin, inspected the property the following day.  Nearly all of the units in Building 1 had varying degrees of fire or water damage, with Units 2 and 3 being the worst.  CAT 5 Restoration, a mitigation contractor, already was on site securing structures and starting the cleanup and restoration process.  Ardoline authorized Schmelling to hire J.S. Held, LLC, a building repair expert, to evaluate the scope and repair cost of the fire damaged property.

---

[1]  I have not considered the testimony of Timothy Wiedmeyer or other evidence that Greystone advanced for the first time on reply, *see* Greystone's Reply Br. and Request to Supplement the Evidentiary Record, dkt. 85, at 1-4 and AmGUARD's Mot. to Strike, dkt. 92, nor have I considered the letter submitted by Greystone at dkt. 78, exh. 74, which is inadmissible under Fed. R. Evid. 408.

On September 11, 2018, Greystone hired its own adjuster, Miller, P.A., to represent it in connection with the claim.

On September 19, 2018, Schmelling emailed Ardoline and asked him to "clarify your coverage statement you made to the Public Adjuster," regarding whether AmGUARD would cover the cost of replacing finishes in the units back to original construction or just the drywall with no finishes.  Schmelling volunteered his view that AmGUARD's policy "covers ceiling, wall and floor finish out, which includes trim work as well," with the quality of the finish equivalent to that which existed at the time of the original construction, and told Ardoline that if he agreed, then Schmelling would convey this to JS Held and to Miller.  Ardoline responded that he agreed with Schmelling's coverage opinion.

J.S. Held representatives spent over 55 hours between August 17 and October 12, 2018 at the property reviewing the damages, analyzing photographs and preparing an initial estimate. On October 12, 2018, J.S. Held submitted a detailed, 189-page line item report to AmGUARD estimating that it would cost $711,496.49 to repair the building.  In the email forwarding the estimate, J.S. Held stated that at the time of its second inspection, Units 2 and 3 were still under investigation and it was not able to perform detailed take-offs, nor had any demolition occurred which would expose potentially damaged framing and components of the building.  J,S. Held indicated that once demolition was complete, it would revisit the property and re-inspect Units 2 and 3 to determine if the "current scope attached needs to be revised to account for additional work."

Ardoline asked Robert Cartagena, a more senior adjuster at AmGUARD, to review J.S. Held's estimate.  Cartagena did so, subtracting amounts for depreciation and interior finishes that he did not think were covered under the condominium association's bylaws.   After

accounting for these deductions, Cartagena estimated that Greystone's costs to repair the building was Replacement Cost Value (RCV) of $576,761.75 and an Actual Cost Value (ACV) of $469,121.71.  Cartagena shared his estimate and his rationale with Ardoline.[2]

Although Ardoline previously had told Greystone that AmGUARD *would* cover the interior finishes, he did not tell Cartagena this, nor did he ask Cartagena to change his estimate. Further, Cartagena was not aware that at the time that J.S. Held had prepared its estimate, at least two of the units still were under investigation and demolition had not been completed.

On November 4, Ardoline presented Cartagena's estimate to Greystone without commenting on AmGUARD's change in position with respect to the interior finishes.

On November 19, 2018, JS Held reinspected the property, including Units 2 and 3, but it did not issue a supplemental report or make any changes to its initial estimate.

On December 4, 2018, Greystone accepted AmGUARD's offer of payment of the ACV amount of $469,121, but indicated that additional amounts were "to be determined."  On December 20, 2018, AmGUARD issued payment of $469,121.71 for the undisputed ACV amount.

Building construction began in early January 2019.  In early February, Greystone, through Miller, submitted to AmGUARD its own detailed estimate of the rebuild costs (the "Miller Estimate").  Miller estimated that the rebuild cost was $1,247,667.05, which was more than double what AmGUARD was predicting.  AmGUARD reengaged J.S. Held to review the

---

[2] Although the parties do not define these terms in their submissions, the standard definition of "actual cash value" is "replacement value minus depreciation." *See Coppins v. Allstate Indem. Co.*, 2014 WI App 125, ¶ 7, 359 Wis. 2d 179, 186, 857 N.W.2d 896, 900  (noting that the Wisconsin Office of the Commissioner of Insurance defines "actual cash value" as: "[t]he value of the property when it is damaged or destroyed. This is usually figured by taking the replacement cost and subtracting depreciation.").

Miller Estimate and to provide an opinion on the additional amounts claimed to be owed for repair costs.

Around that same time, AmGUARD engaged Young & Associates, a water/fire restoration firm, to review a large invoice that had been submitted by CAT 5 for its cleanup and remediation work. On March 17, 2019, Young & Associates submitted to Engle Martin a report stating that it had reached an agreement with CAT 5 that $352,500 was the fair market value of their remediation and mitigation services. Engle Martin forwarded the Young & Associates' report to AmGUARD on April 29, 2019, offering its opinion that the $352,500 amount was excessive and should be closer to $290,000.

Meanwhile, on March 11, 2019, J.S. Held's adjuster, Chris Smith, met with Miller and the general contractor and inspected the property. On March 13, 2019, Smith advised AmGUARD of some changes that needed to be made to Miller's estimate and said that he would soon review it "side by side" with AmGUARD's original estimate, verify that proper items that should be credited were captured, and would recommend changes based on his on-site inspection.

Due to unexplained personal issues, however, Smith dropped *incommunicado* for several weeks. This greatly consternated Greystone: its affected unit owners already were complaining that the rebuild was taking too long (even though it was mostly on schedule), and Greystone was aware that AmGUARD was awaiting Smith's review on behalf of J.S. Held. AmGUARD was equally vexed by Smith's unresponsiveness and took its concerns to J.S. Held's upper management.

5

On May 10, 2019, Tom Constantini from J.S. Held sent the following email to Ardoline:

> I was finally able to discuss the loss, and outstanding issues with the [public adjuster], David Miller. The general contractor provided a detailed proposal, in the amount of $1,245,167, to complete all the repairs. Chris & the GC went through the estimate, line by line, and agreed to the scope. The only issue was with the roof trusses, and associated framing which Chris asked for support for these scope items. An engineering report, vendor & contractor detailed support documents were provided. That said, there should be no other questions regarding the scope or cost to complete the repairs. Chris, please add anything that I may be missing.

That same day, May 10, 2019, Ardoline emailed to Miller a Proof of Loss form "for an interim $50,000 advance while we await further information." Greystone refused to accept this payment.

On May 13, 2019, J.S. Held finally provided AmGUARD with its report, completed by one of its other associates.

On May 17, 2019, Ardoline and Cartagena met to review the J.S. Held supplemental report and the CAT 5 invoice. The J.S. Held supplemental analysis was four pages in total, including two pages of line item summaries that described recommended reductions and removal of line items with reference to the Miller Estimate and two additional pages describing credits and overlap between the estimates. J.S. Held suggested a reduction of $31,864 from the Miller Estimate, after which the costs of the building repairs would be $1,213,303.03.

Ardoline and Cartagena both claimed at their depositions that J.S. Held's May 13 supplement lacked the detail necessary for AmGUARD to fairly determine whether the amounts claimed in the Miller Estimate were reasonable. J.S. Held had not compared the Miller Estimate and AmGUARD's initial estimate "side by side," which meant, said Ardoline and Cartagena, that they could not discern why the Miller Estimate of the rebuild cost was half a million dollars

6

higher than the initial J.S. Held estimate that had informed AmGUARD's December ACV payment.

Even so, no one at AmGUARD followed up with J.S. Held to ask it for a better report, or to explain the basis for its new estimate, or to otherwise address why it hadn't provided the detailed analysis that AmGUARD had requested. AmGUARD did not attempt to independently perform any side-by-side analysis of the two estimates nor did it attempt to retain anyone else to perform such a review.

Instead, that same day, Ardoline emailed Greystone, through Miller, and stated that, although AmGUARD had "been attempting to resolve this matter for the past few months," it had unfortunately "been receiving incomplete information that would allow for a fair and accurate evaluation of the damages." Despite this statement, Ardoline then said that AmGUARD had "reviewed this matter in its entirety" and had "completed" its evaluation, the results of which were that its initial determination that the rebuild would cost $576,761.75 was "unchanged." Ardoline stated that AmGUARD was "prepared to conclude the ACV portion of the claim" for what it had previously paid plus an additional $274,263.34 for CAT 5's remediation work. Ardoline made no mention of the fact that AmGUARD had finally received the supplemental report from J.S. Held that everyone was waiting for, nor did he reveal that J.S. Held basically agreed with Greystone that the rebuild losses were $1.2 million.

Greystone disagreed with the loss amounts proposed by AmGUARD. Accordingly, on June 3, it invoked its right under the policy to demand an appraisal of the loss. Under the policy's appraisal provision, each party was to select a "competent and impartial appraiser," and together the appraisers would select an umpire, who would consider the appraisals and make a binding decision on the amount of loss. AmGUARD first sought to retain its own outside

7

adjuster, Engle Martin, as its appraiser, but Engle Martin declined, so AmGUARD hired an appraiser from a different firm.  The policy provided that each party would pay its chosen appraiser and share equally the costs of the umpire.  At the time Greystone invoked appraisal, the rebuild project was approximately 33 percent complete, with work having been done on the exterior only.

On August 8, 2019, Greystone filed the instant lawsuit in state court, before the appraisal process had been completed.  Greystone alleged that an appraisal would not have been necessary if AmGUARD had followed the recommendations of its consultants (J.S. Held and Young & Associates) as to the loss amounts instead of offering on May 17 to "conclude" the claim for unreasonably low amounts.

On August 13, 2019, the appraisers and the umpire visited the property, reviewed the competing estimates, and determined that the remediation costs owed to CAT 5 were $372,466.32 and the reconstruction costs were $1,242.110.11 (RCV) or $1,055.793.59 (ACV).  AmGUARD paid those amounts to Greystone, less amounts already paid, within 30 days of the award.

 On September 13, 2019, AmGUARD removed Greystone's lawsuit to this court.  Greystone acknowledges that AmGUARD has paid it all amounts due and owing under the insurance contract, but it contends that it is entitled to recover its costs of hiring Miller, the costs of the appraiser, and prejudgment interest.

DISCUSSION

## I.  Summary Judgment Standard

Rule 56 authorizes the court to grant summary judgment to a party when "there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Burton v. Kohn Law Firm, S.C.*, 934 F.3d 572, 578 (7th Cir. 2019).  To stave off summary judgment, a non-moving party must present enough evidence to create a genuine question of fact with respect to all elements of their claims.  *Burton*, 934 F.3d at 578.  A genuine question of fact exists only when a rational factfinder could return a verdict in favor of the non-moving party.  *Id*.; *see also Modrowski v. Pigatto*, 712 F.3d 1166, 1168 – 69 (7th Cir. 2013). The evidence is viewed in the light most favorable to the non-moving party. *Lavallee v. Med-1 Solutions, LLC*, 932 F.3d 1049, 1054 (7th Cir. 2019).

## II.  Bad Faith

In Wisconsin, bad faith is a tort "separate and apart from a breach of contract." *Anderson v. Continental Ins. Co.*, 85 Wis. 2d 675, 686 (1978).  "It is a separate intentional wrong, which results from a breach of duty imposed as a consequence of the relationship established by contract," and as such, separate damages may be recovered for bad faith and for breach of contract.  *Id*. at 687, 271 N.W.2d 368.[3]

To prove bad faith against an insurance company, the plaintiff must establish: (1) a wrongful denial of benefits under the policy, *i.e.*, breach of contract; (2) there was no reasonable basis for the insurer to deny the insured's claim for benefits under the policy; and (3) the insurer

---

[3] Bad faith claims also allow the insured to seek punitive damages and attorneys' fees, *See Choinsky v. Germantown School District Board of Educ*, 386 Wis. 2d 285, 298, 926 N.W.2d 196, 203 (Ct. App. 2019), which Greystone has done here, *see* dkt. 36 at 32.

knew of, or recklessly disregarded, the lack of a reasonable basis to deny the claim. *Brethorst v. Allstate Prop. & Cas. Ins. Co.*, 2011 WI 41, ¶¶ 36, 49, 53–54, 334 Wis.2d 23, 798 N.W.2d 467; *Anderson*, 85 Wis.2d at 692, 271 N.W.2d 368. *See also* Wis JI—Civil 2761. Assessing whether the insurer has a reasonable basis to reject a claim is an objective analysis, whereas the second element is subjective. *Mills v. Regent Ins. Co.*, 152 Wis. 2d 566, 576, 449 N.W.2d 294, 298 (Ct. App. 1989). "The knowledge of the lack of a reasonable basis may be inferred and imputed to an insurance company where there is a reckless disregard of a lack of a reasonable basis for denial or a reckless indifference to facts or to proof submitted by the insured." *Anderson*, 85 Wis.2d at 693, 271 N.W.2d 368. Because bad faith is an intentional tort, the plaintiff must prove it by clear and convincing evidence. Wis JI—Civil 2761.

The parties appear to agree that, regardless of the egregiousness of AmGUARD's conduct, it cannot be found liable for bad faith unless it denied Greystone's covered losses without an objectively reasonable basis for its denial. *See Brethorst*, 2011 WI 41, ¶ 70, 334 Wis. 2d 23, 53, 798 N.W.2d 467, 483 ("An insurer's bad behavior unrelated to a breach of contract might be subject to some sanction, but it does not warrant a first-party bad faith claim.").

A threshold question raised by the parties' submissions is whether AmGUARD actually "denied" Greystone's claim on May 17, 2019. AmGUARD contends that it didn't, insisting that "the claim adjustment was ongoing and additional costs could and would be paid as they were incurred." AmGUARD's Reply Br., dkt. 93, at 14. AmGUARD points out that its May 17 correspondence expressly advised Greystone it had "been receiving incomplete information that would allow for a fair and accurate evaluation of the damages" and that Greystone was well aware that AmGUARD had been waiting on J.S. Held's review of the Miller Estimate. AmGUARD further notes that just days earlier, it had offered Greystone an interim building

advance of $50,000, which it says was a tacit admission that it owed more than the amount of its initial ACV payment.  According to AmGUARD, its position on May 17 was not that it did not owe the loss amount claimed by Greystone, but rather "that it did not have enough information to increase its previous ACV payment[.]" *Id*. at 15.

AmGUARD's contention prompts skepticism.  First, AmGUARD has not cited any evidence to support its assertion that it could and would pay additional costs to Greystone as they were incurred even if Greystone accepted its May 17 offer.  In fact, AmGUARD strongly implied the contrary by advising Greystone that it had "reviewed this matter in its entirety and have completed our evaluation" and was prepared to "conclude the ACV portion of the claim" for the original amount paid plus an additional $274,263.34 for remediation.[4]

Second, even accepting AmGUARD's contention that J.S. Held's supplemental report was inadequate to permit an informed review of the Miller Estimate, AmGUARD has presented no evidence that it was taking any further steps to analyze the Miller Estimate between May 17 and June 3, the date that Greystone invoked its right to appraisal.  Although AmGUARD suggests that it did not have time to take further action before Greystone invoked appraisal, seventeen days was ample time for AmGUARD to have done *something*.  At the very least, AmGUARD could have–and should have–advised Greystone that it needed more time to review the Miller Estimate because J.S. Held had submitted an inadequate report. *Cf. Duir v. John Alden Life Ins. Co.*, 573 F. Supp. 1002, 1009 (W.D. Wis. 1983), aff'd, 754 F.2d 245 (7th Cir.

---

[4] Although the policy provides that "In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim on a replacement cost basis if you notify us of your intent to do so within 180 days after the loss or damage," AmGUARD has adduced no evidence to show that it later would have paid replacement costs that exceeded the RCV value of $576,761.75. Nor has AmGUARD explained how the general contractor was supposed to proceed with construction without knowing when or how much it would be paid.

11

1985) (rejecting insured's claim that insurer failed to reasonably investigate where adjuster "did not deny the claim or merely fail to pay it, but instead responded responsibly by requesting further information from Duir within five days of his receipt of the hospital bill.").  The absence of any evidence that AmGUARD was taking action on Greystone's claim after May 17 coupled with AmGUARD's failure to notify Greystone that it finally had received J.S. Held's supplement support a finding that AmGUARD had denied the claim and had breached the contract at that point.  *Duir*, 573 F. Supp. at 1009 (noting that if adjuster had taken no action after insured submitted hospital bill, "[a] finder of fact could conceivably find in that situation that [the insurer] had breached its contractual duty to investigate and adjust first party claims of its insureds fairly, making it liable under the contract.").

That said, the fact that AmGUARD offered a $50,000 "interim building advance" payment to Greystone on May 10 lends at least some support to AmGUARD's contention that its self-contradictory May 17 letter was not actually a claim denial, but was a poorly-worded attempt to update Greystone.  AmGUARD points out that it would make no sense for AmGUARD to pester J.S. Held for two months to provide its supplement if AmGUARD wasn't genuinely interested in obtaining J.S. Held's opinion.  These facts provide at least weak support for AmGUARD's claim that it did not deny Greystone's claim on May 17.

Moreover, the issues of when and whether AmGUARD denied Greystone's claim is bound up with the questions of whether AmGUARD had a reasonable basis for denying the claim and whether it knew or recklessly failed to ascertain that the claim should have been paid. Accordingly, I am going to wait to rule on this issue until I have heard the witnesses' testimony at trial.

Material disputes of fact also preclude summary judgment to either party on the remaining elements of bad faith with respect to the reconstruction losses.  The record allows competing inferences on the question whether AmGUARD had a reasonable basis not to pay Greystone's claim for $1.2 million.  Although it may be true, as Greystone argues, that AmGUARD had reason to know from its consultants that Greystone's claim surely was going to exceed AmGUARD's initial estimate of $576,761.75, that does not necessarily show that AmGUARD lacked a reasonable basis to disagree with Greystone's $1.2 million estimate and demand.  Greystone cites no case holding that a claim for bad faith lies any time an insurer disagrees with the opinions of its hired consultants.

At the same time, there are facts supporting an inference of reckless indifference: AmGUARD's summary rejection of the J.S. Held supplement without further inquiry or communication to either J.S. Held or Greystone;  Ardoline's failure to advise Cartagena that his initial estimate of $576,761.75 did not account for finishes that Ardoline had previously agreed were covered under the policy; and facts suggesting that AmGUARD knew or should have known that J.S. Held's initial estimate (from which Cartagena derived his estimate) may have been incomplete and therefore unreasonably low.  I will need a more complete presentation of the facts surrounding J.S. Held's initial estimate and supplemental report and AmGUARD's responses before I can determine whether AmGUARD reasonably rejected the supplement in favor of the initial estimate, or otherwise had a reasonable basis to dispute Greystone's claimed loss amounts.[5]

_____

[5] Greystone points out that, in addition to the reports from J.S. Held, AmGUARD received a number of reports from Engle Martin's Schmelling, in which he estimated the cost of reconstruction to be significantly higher than the $576,000 figure offered by AmGUARD.  I have not considered these reports because Greystone did not authenticate them.  Assuming that Greystone can cure this defect, however, Schmelling's reports lend further support to Greystone's position, notwithstanding his deposition testimony that the reserve amounts recommended in his reports were merely "placeholders."

Moreover, "'[s]ummary judgment is notoriously inappropriate for determination of claims in which issues of intent, good faith and other subjective feelings play dominant roles.'" *Stumph v. Thomas & Skinner, Inc.*, 770 F.2d 93, 97 (7th Cir.1985) (quoting *Pfizer, Inc. v. Int'l Rectifier Corp.*, 538 F.2d 180, 185 (8th Cir. 1976)).  For the most part, the evidence on which Greystone relies to prove the subjective prong of the test also is relevant to the objective prong of the test. Even if it *was* appropriate for me to decide the objective prong now, there is little downside to deferring this decision until trial, given that the question of AmGUARD's subjective intent needs to be tried anyway.

I reach a different conclusion with respect to the mitigation expenses.  Greystone admits that Cartagena and Ardoline reviewed the Young & Associates' report, along with CAT 5's invoice and report from Engle Martin, before offering to settle the mitigation portion of the claim for the $274,000 figure. Greystone insists that AmGUARD had no legitimate reason to reject Young & Associates' opinion that the "fair market value" of CAT 5's mitigation work was $352,500, but Greystone admits that AmGUARD's independent adjuster, Engle Martin, advised AmGUARD that $352,500 was excessive and that a fair price was probably somewhere around $290,000.  This is enough to show that AmGUARD had an objectively reasonable basis to reject the $352,500 number and that AmGUARD did not "recklessly ignore" it.

Notably, Greystone offers no critique of Engle Martin's opinion; its complaint is only that AmGUARD failed to explain precisely *how* it determined that $274,263.34 was the proper amount.  (AmGUARD says Cartagena arrived at this figure by deducting supervision fees and billing for costs of equipment and other non-disposable goods typically covered in overhead by remediation contractors, but it has not adduced admissible evidence to back this up.)  Greystone does not suggest that it would have forsworn its right to an appraisal if AmGUARD had offered

14

$290,000, so it is hard to see how Greystone was hurt by AmGUARD's failure meticulously to back up the $274,000 figure. An insurer does not commit bad faith simply by failing to "show its work." *Advance Cable Co., LLC v. Cincinnati Ins. Co.*, 788 F.3d 743, 749 (7th Cir. 2015)("Advance's argument that Cincinnati should have 'shown its work,' right down to revealing the dictionary definitions the company reviewed internally when evaluating coverage, goes well beyond anything that the law requires to defeat an allegation of bad faith."); *Samuels Recycling Co. v. CNA Ins. Cos.*, 223 Wis.2d 233, 248, 588 N.W.2d 385 (Ct. App. 1998) (when an objectively reasonable basis to deny coverage exists, "it is not necessary to consider evidence of investigation flaws or the subjective element of bad faith.").

Finally, insofar as Greystone complains generally that AmGUARD took too long to review the CAT 5 invoice, Greystone has not alleged that it suffered any harm as a result of the delay.  For all these reasons, AmGUARD is entitled to summary judgment on Greystone's bad faith claim regarding payment of the mitigation expenses.


## III.  Breach of Contract

Greystone contends that AmGUARD breached the contract in a number of ways besides wrongfully denying Greystone's claim on May 17, 2019.  None of Greystone's theories has traction.

A claim for breach of contract has three elements: (1) a contract between the parties that creates obligations from the defendant to the plaintiff; (2) the defendant's failure to fulfill those obligations; and (3) damages flowing from the breach.  *Brew City Redev. Grp., LLC v. Ferchill Grp.*, 2006 WI App 39, ¶ 11, 289 Wis. 2d 795, 714 N.W.2d 582. An insurance company commits a breach of contract when it fails to pay the insured's claim in accordance with the policy.

*Anderson*, 85 Wis. 2d at 686, 271 N.W.2d at 374; *Brethorst*, 334 Wis. 2d at 35, 798 N.W.2d at 473 (referring to a breach of contract claim as a "wrongful denial of some contracted-for benefit.").

First, Greystone says that AmGUARD breached the policy's Loss Payment provision when it delayed until September 19, 2018  to "affirm or deny" that the policy covered interior finishes in the individual units, and that this is why Greystone hired a public adjuster.[6]  But Greystone hired Miller on September 11, 2018, *before* Greystone says AmGUARD's 30 day time limit had expired.  *See* Br. In Opp., dkt. 75, at 14 (arguing that AmGUARD's 30-day deadline "lapsed on September 15, 2018").  Moreover, even assuming, *arguendo*, that the Loss Payment provision somehow could be read to require a prompt coverage decision, it does not apply until the insurer has received a sworn proof of loss.  Greystone presents no evidence that it submitted a sworn proof of loss–or *any* proof of loss–to AmGUARD before it retained Miller.  Indeed at this point in the timeline–a mere 28 days after the fire–no one fully understood what the losses actually were.  Accordingly, even when the court accepts Greystone's explanation that it hired Miller because it inferred that AmGUARD was reluctant to commit to a favorable coverage decision on the interior finishes, Greystone cannot recover those costs because AmGUARD was not in breach of the policy at that time.

---

[6] The Loss Payment provision provides:
In the event of loss or damage covered by this policy:
  a.  At our option, we will either:
      (1) Pay the value of lost or damaged property;
      (2) Pay the cost of repairing or replacing the lost or damaged property;
      (3) Take all or any part of the property at an agreed or appraised value; or
      (4) Repair, rebuild or replace the property with other property of like kind and quality .
  b.  We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

Second, Greystone contends that AmGUARD breached the Loss Payment provision when, upon reviewing JS Held's Initial Estimate on November 4, 2018, adjuster Cartagena "unilaterally changed the scope of coverage [that Ardoline had previously agreed to] without communicating those changes" to Greystone and those changes occurred "well after the 30-day time period to confirm or deny coverage . . .".  Br. in Opp., dkt. 75, at 17-18.  This claim requires little discussion.  As just noted, the Loss Payment provision did not require AmGUARD to "confirm or deny" coverage within 30 days of a loss.  Moreover, Greystone presents no evidence that it even was aware of Cartagena's change until the appraisal proceeding, and it acknowledges that AmGUARD ultimately paid for the broader scope of coverage.  Even assuming, *arguendo*, that Cartagena's "change" in the scope of coverage somehow breached the policy, Greystone could not have been damaged by it because (1) Greystone had no knowledge of this until *after* Greystone invoked the policy's appraisal provision; and (2) Cartagena's coverage determination was later reversed.  Absent damages, Greystone has no viable breach of contract claim.[7]

Third, Greystone contends that AmGUARD breached the policy's Loss Payment provision and Wis. Stat. § 628.46(1)[8] multiple times when it failed to pay undisputed loss

---

[7] As noted previously, Cartagena's reversal of Ardoline's coverage determination *is* relevant to Greystone's claim that AmGUARD knew or recklessly disregarded the fact that its initial estimate of the loss was unreasonably low.

[8] Wis. Stat. § 628.46(1) provides that an insurer is liable for interest on claims that are "overdue," which are defined as follows:

> A claim shall be overdue if not paid within 30 days after the insurer is furnished written notice of the fact of a covered loss and of the amount of the loss .... Any payment shall not be deemed overdue when the insurer has reasonable proof to establish that the insurer is not responsible for the payment, notwithstanding that written notice has been furnished to the insurer.

Wisconsin courts have held that Section 628.46(1) "constitutes an additional provision of the insurance contract incorporated into it as a matter of law."  *Poling v. Wisconsin Physicians Serv.*, 120 Wis. 2d 603, 612,

amounts within 30 days of receiving proof of the loss from Greystone. However, Greystone has not identified any date on the timeline on which the loss amounts were undisputed. Insofar as Greystone may be suggesting that AmGUARD should have made partial payments until the claim was finally resolved, it is undisputed that AmGUARD did offer such payments but Greystone rejected them.[9]

Fourth, Greystone alleges that AmGUARD violated various provisions of Wis. Adm. Code sec. Ins. 6.11, which lists thirteen examples of "unfair claim settlement practices," which, "if committed by any person without just cause and performed with such frequency as to indicate general business practice, shall constitute unfair methods and practices in the business of insurance." Wis. Adm. Code sec. Ins. 6.11(3)(a). Greystone argues that these provisions are incorporated into the insurance policy by virtue of the "Wisconsin Changes" endorsement, which provides that "[a]ny provision of this Policy . . . that is in conflict with a Wisconsin statute or rule is hereby amended to conform to that statute or rule." But Greystone doesn't identify any provision of the policy that conflicts with any Wisconsin statute or rule. Moreover, the provisions of Wisconsin's administrative code do not create a private right of action. *Heyden v. Safeco Title Ins. Co.*, 175 Wis. 2d 508, 523, 498 N.W.2d 905, 910 (Ct. App. 1993), overruled on other grounds by *Weiss v. United Fire & Cas. Co.*, 197 Wis. 2d 365, 541 N.W.2d 753 (1995). Accordingly, Greystone cannot proceed on a breach of contract theory based on AmGUARD's

---

357 N.W.2d 293, 298 (Ct. App. 1984) (citing *Anderson*, 85 Wis. 2d at 696, 271 N.W. 2d at 379).

[9] Specifically, AmGUARD made advance payment offers of $150,000 on October 17, 2018, $200,000 on October 31, 2018, and $50,000 on May 10, 2019. Although Greystone argues that it rejected these offers because it did not approve of the Proof of Loss forms that AmGUARD demanded Greystone sign in order for it to release payment, it presents no evidence to support its suggestion that AmGUARD acted unreasonably or breached the contract by demanding that Greystone sign a form in exchange for payment. Even if Greystone may have had legitimate reasons for declining to sign the Proof of Loss forms, the fact remains that Greystone rejected the offers.

alleged breach of these provisions.  Greystone can, however, introduce evidence concerning Wis. Adm. Code sec. Ins. 6.11 to support its claim of bad faith.  *Id*.

Finally, Greystone contends that AmGUARD breached its "contractual obligation to select an impartial appraiser" to represent it during the appraisal process because AmGUARD first sought to retain its own outside adjuster, Engle Martin.  Br. in Opp., dkt. 75, at 25.  But it is undisputed that Engle Martin declined the appointment and AmGUARD instead hired an appraiser from a different firm.  Greystone does not explain how AmGUARD's unsuccessful attempt to retain Engle Martin harmed Greystone or denied it a benefit under the policy.

## IV. Damages

AmGUARD argues that Greystone has no damages resulting from any breach of contract --and therefore has no claims for breach of contract or bad faith–because AmGUARD ultimately paid Greystone a quarter-million dollars *more* than what Greystone actually spent to repair the property.  This argument resonates on an equitable level, which probably is AmGUARD's point. But AmGUARD cites no legal authority for its contention that Greystone's pocketing of between $66,183.43 and $257,056.23 (depending on whether Greystone actually paid a $190,872.80 outstanding invoice to its general contractor[10]) from AmGUARD defeats Greystone's breach of contract claim.  Notably, AmGUARD does not deny that Greystone was *entitled* under the policy to the amounts that AmGUARD paid, and it has not asserted any counterclaim that might offset Greystone's claimed damages.  As Greystone points out, AmGUARD was required under the policy to pay Greystone's losses as determined at appraisal.  AmGUARD cites no authority for

---

[10] I am citing this evidence to describe AmGUARD's argument.  I am not deciding whether it is admissible.

its suggestion that, by negotiating with its vendors for a lower price than what was awarded at appraisal, Greystone somehow waived its right to assert a claim for damages based on AmGUARD's alleged breach of the policy.  Absent a more persuasive argument from AmGUARD on this point, I decline to find that Greystone must demonstrate an actual out-of-pocket loss to maintain its claim for breach of contract/bad faith.

## ORDER

IT IS ORDERED that:

(1)  Defendant AmGUARD's motion to strike, dkt. 92, is GRANTED;

(2) Plaintiff Greystone Condominium at Blackhawk Owners Association, Inc.'s motion for summary judgment, dkt. 35, is DENIED; and

(3) Defendant AmGUARD's motion for summary judgment, dkt. 50, is GRANTED IN PART and DENIED IN PART in the manner set forth in this order.

Entered this 19th day of January, 2021.

BY THE COURT:

/s/

_____
STEPHEN L. CROCKER
Magistrate Judge

20